# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-2679
_____

J.B. Hunt Transport, Inc.

*Plaintiff - Appellant*

v.

BNSF Railway Company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville

_____

Submitted: April 14, 2021
Filed: August 13, 2021

_____

Before GRUENDER, BENTON, and SHEPHERD, Circuit Judges.

_____

GRUENDER, Circuit Judge.

On October 24, 2019, an arbitration panel (the "Panel") issued its award (the "Award") in a dispute between J.B. Hunt Transport, Inc. and BNSF Railway Co. Hunt moved the district court to confirm the Award and to provide additional relief, which Hunt described as "enforcement" of the Award. The district court confirmed the Award but denied Hunt's request for additional relief. Hunt appeals. We affirm in part and reverse in part.

**I.**

BNSF, a railroad company, and Hunt, a trucking company, entered into a Joint Service Agreement (the "JSA") in 1996. Under the terms of the JSA, either BNSF or Hunt may offer a customer a quote for door-to-door shipping service. If the customer accepts the offer, then Hunt trucks the load from the customer's origin point to a nearby BNSF ramp, BNSF ships the load by rail to a ramp near the customer's destination point, and Hunt trucks the load from the ramp to the destination point. Section 1 of the JSA requires each party to "provide the other with all shipping and billing information for all movements in joint service." Although the JSA permits either party to offer quotes to potential customers, in practice, it has been Hunt that has solicited business under the JSA.

The JSA provides two methods for allocating the revenue from a joint-service shipment. The default method is for BNSF and Hunt to split the revenue according to a fixed formula (the "Revenue Split"). At Hunt's option, however, the parties may use the method described in section 3(a) of the JSA instead. Section 3(a) provides that "any rates for movement of dry vans, refrigerated or protective service trailers or containers or flatbed trailers [BNSF] makes available to any truckload motor carrier for movement over [BNSF's] lines, will also be made available on an equivalent or at least as favorable basis to [Hunt] for comparable service." We use the term "Rate Offer" to refer to an offer package composed of a rate and the terms and conditions that constitute the "basis" on which the rate is being provided. Thus, under section 3(a), Hunt may select a Rate Offer that BNSF has extended to another truckload carrier for comparable service and apply it to the rail portion of a joint-service shipment in lieu of paying BNSF its share of the Revenue Split.

In 2017, the parties brought several JSA-related disputes to the Panel pursuant to the JSA's arbitration provision. Some of these disputes concerned sections 1 and 3(a). In 2019, the Panel issued the Award, which took the form of a final decision (the "Final Ruling") that incorporated multiple interim decisions, including one issued in 2018 (the "Interim Ruling"). The Panel explicitly "decline[d] to award

damages or other penalty, order, etc., as to section 3(a)." It did, however, attempt to clarify the parties' obligations under sections 1 and 3(a), in part by specifying the factors that determine "what constitutes an 'equivalent or at least as favorable basis' and 'comparable service' for purposes of JSA Section 3(a)."

Immediately, Hunt and BNSF disagreed about how to interpret the Award. First, Hunt claimed, and BNSF denied, that the Panel's lists of equivalent-basis and comparable-service factors are exclusive. Second, the parties disagreed about which Rate Offers the Panel held BNSF must disclose and permit Hunt to use in lieu of the Revenue Split.

Hunt moved the district court to confirm the Award. It also moved for additional relief, which it labeled "enforcement" relief, consisting of "an order specifically setting forth BNSF's obligations [under section 3(a) as interpreted by the Award] and requiring BNSF to comply with them." BNSF agreed that the Award should be confirmed but opposed Hunt's request for additional relief. According to BNSF, Hunt's request for additional relief rested on a misinterpretation of the Award, and even it if did not, the district court had no authority to grant the relief.

The district court confirmed the Award but denied Hunt's request for additional relief on the ground that it rested on a misinterpretation of the Award. Hunt appeals. As it did before the district court, BNSF both contests Hunt's interpretation of the Award and maintains that, even assuming Hunt's interpretation is correct, Hunt was not entitled to the additional relief it requested.

## II.

We begin with BNSF's arguments that we need not reach the parties' dispute about the interpretation of the Award because even assuming Hunt's interpretation is correct, the district court properly denied Hunt's request for additional relief. *See Duffner v. City of St. Peters*, 930 F.3d 973, 976 (8th Cir. 2019) ("We may affirm on any ground supported by the record."). We review legal determinations *de novo* and

-3-

factual findings for clear error. *See RGA Reins. Co. v. Ulico Cas. Co.*, 355 F.3d 1136, 1138 (8th Cir. 2004).

A.

BNSF's first argument is that Hunt's request for additional relief was premature. As BNSF notes, Hunt captioned its request for additional relief as a request for "enforcement" of the Award. According to BNSF, this request was premature because "an arbitration award is . . . converted to a judgment" only when it is confirmed, and "until there is a judgment, there is nothing for federal courts to 'enforce.'"

BNSF would be correct if Hunt had been using "enforcement" in the standard sense of the term, to refer to the imposition of sanctions on a party for violation of a court order. *See, e.g.*, *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 835 (1994) (using "enforcement" in this sense). As BNSF points out, an arbitration award acquires the force of a court judgment only when it is confirmed. *See Domino Grp., Inc. v. Charlie Parker Mem'l Found.*, 985 F.2d 417, 420 (8th Cir. 1993) (explaining that confirmation is what "convert[s an award] into a court judgment"). Therefore, if Hunt had been asking the district court to sanction BNSF for its alleged failure to comply with the terms of the as-of-then-unconfirmed Award, then Hunt's request would have been premature.

But Hunt's filings make clear that it was not asking for "enforcement" in this sense. Instead, the substance of Hunt's request for additional relief was twofold. First, Hunt explained that it sought "an order specifically setting forth BNSF's [section 3(a)] obligations" under the Award because BNSF had refused to recognize the Panel's holdings. In other words, Hunt was asking for a declaratory judgment adopting its interpretation of the Award's interpretation of section 3(a). Second, Hunt explained that it was seeking a court order "requiring BNSF to comply" with its section 3(a) obligations because Hunt feared that BNSF would not perform its section 3(a) obligations unless under threat of sanctions for contempt of court. In

-4-

other words, in addition to a declaratory judgment adopting Hunt's interpretation of the Award's interpretation of BNSF's section 3(a) obligations, Hunt was asking for an order of specific performance directing BNSF to discharge those obligations. *Cf. Koolvent Metal Awning Corp. of Am. v. Bottom*, 205 F.2d 209, 215 (8th Cir. 1953) (describing "a suit for specific performance" as a request for "enforcement of the contract[]").

Neither of these two forms of relief presupposes that BNSF's alleged failure to comply with the terms of the Award prior to its confirmation constitutes a breach of a court order. Therefore, focusing on the substance of Hunt's request for additional relief rather than how Hunt captioned it, *see BBCA, Inc. v. United States*, 954 F.2d 1429, 1431-32 (8th Cir. 1992), we conclude that the request was not premature.

B.

BNSF's second argument, in essence, is that Hunt's request for additional relief is either moot or statutorily precluded. On the one hand, confirmation of an award "convert[s it] into a court judgment." *Domino Grp.*, 985 F.2d at 420. Therefore, BNSF reasons, if Hunt was asking the district court for an order that merely reiterated what the Award already held, then Hunt's request for "additional relief" was redundant given its request for confirmation. In that case, having granted Hunt's request for confirmation, the district court should have denied Hunt's request for additional relief as moot. *See DeFunis v. Odegaard*, 416 U.S. 312, 316-17 (1974) (per curiam) (dismissing a claim as moot because the plaintiff had received everything he requested). On the other hand, BNSF reasons, if Hunt was asking the district court for an order that went beyond what the Award already held, then Hunt was asking the district court to modify the Award. In that case, the district court should have denied Hunt's request for additional relief as precluded by 9 U.S.C. § 11, which enumerates the exclusive grounds for modifying an award, *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 578 (2008), none of which either party maintains is present here.

We agree with BNSF in part, but we also disagree in part. Insofar as Hunt was requesting a declaratory judgment, we disagree. "In a case of actual controversy within its jurisdiction," subject to exceptions inapplicable here, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). A dispute about the scope of one party's contractual obligations to another is an "actual controversy" that either party has the requisite interest to ask a federal court to resolve by a declaration pursuant to § 2201(a). *See, e.g.*, *Maytag Corp. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 687 F.3d 1076, 1081-82 (8th Cir. 2012). And a dispute about what a confirmed arbitration award *held* to be a party's contractual obligations is a dispute about what the party's contractual obligations *are* as far as the law is concerned. *See Am. Postal Workers Union v. U.S. Postal Serv.*, 550 F.3d 27, 30 (D.C. Cir. 2008) (explaining that a confirmed award's interpretation of a contract "is to be treated as though it were a written stipulation by the parties setting forth their own definitive construction of the contract" (internal quotation marks omitted)). Therefore, a dispute about what an arbitration award held to be one party's contractual obligations to another is a dispute that either party has the requisite interest to ask a federal court to resolve by a declaration pursuant to § 2201(a). *Cf. RGA*, 355 F.3d at 1138-39 (affirming the district court's resolution of a dispute about how much money an arbitration award required one party to pay the other, albeit without framing this remedy as a declaratory judgment); *Brotherhood of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty. v. Celotex Corp.*, 708 F.2d 488, 491 (9th Cir. 1983) (affirming the district court's resolution of a dispute about what an arbitration award held a contract required of one of the parties, albeit without framing this remedy as a declaratory judgment).

Here, the parties disagree about what the Award held to be BNSF's section 3(a) obligations to Hunt. For the reasons explained above, Hunt had the requisite interest to ask the district court to resolve this dispute by declaration after confirming the Award. And this dispute lay within the district court's subject-matter jurisdiction because the parties are diverse and the amount in controversy exceeds

$75,000. *See* 28 U.S.C. § 1332(a). Therefore, assuming Hunt's interpretation of the Award is correct, it was entitled to a declaratory judgment to that effect once the district court had confirmed the Award.

BNSF's argument to the contrary does not persuade us. By clarifying the meaning of the Award, a declaratory judgment would give Hunt something that confirmation of the Award did not. Therefore, the district court's confirmation of the Award did not render Hunt's request for a declaratory judgment moot. And by *only* clarifying the meaning of the Award, a declaratory judgment would leave the Award unmodified. *See RGA*, 355 F.3d at 1139 (holding that clarification of an arbitration award does not constitute modification of the award). Therefore, 9 U.S.C. § 11 does not preclude granting Hunt's request for a declaratory judgment.

Insofar as Hunt was requesting an order of specific performance, however, we agree with BNSF. If the Award had ordered specific performance, then the district court's confirmation of the Award would have rendered Hunt's request for another order of specific performance moot. *See DeFunis*, 416 U.S. at 316-17. In fact, the Panel explicitly "decline[d] to award damages or other penalty, order, etc., as to section 3(a)." Therefore, Hunt's request for an order of specific performance was not moot. But, for the same reason, it was statutorily precluded. Unlike merely clarifying the Award, granting a remedy that the Award did not grant would constitute modifying the Award. *See, e.g.*, *In re Petrie v. Clark Moving & Storage, Inc.*, No. 09-CV-06495, 2010 WL 1965801, at *5 (W.D.N.Y. May 17, 2010) (noting that if an arbitration award is silent on interest, then to add interest would be to modify the award). And Hunt does not claim that the conditions for modifying an award under 9 U.S.C. § 11 are present. Therefore, because the Award did not order specific performance, 9 U.S.C. § 11 precluded the district court from doing so.

In sum, we agree with BNSF that we need not reach the merits of the parties' dispute about the interpretation of the Award to conclude that the district court properly denied Hunt's request for "enforcement" insofar as it was a request for an

order of specific performance.[1]  But we do need to reach the merits of the parties'
dispute about the interpretation of the Award to determine whether the district court
properly denied Hunt's request for "enforcement" insofar as it was a request for a
declaratory judgment.  Accordingly, we turn to the merits of the parties' interpretive
dispute.

## III.

We review a district court's interpretation of an arbitration award *de novo*.
*Turner v. United Steelworkers of Am., Loc. 812*, 581 F.3d 672, 673 (8th Cir. 2009).
Here, the parties disagree about (1) whether the Award's comparable-service and
equivalent-basis factors are exclusive and (2) which Rate Offers the Award obligates
BNSF to disclose and permit Hunt to use in lieu of the Revenue Split.  We resolve
these disagreements in Sections B and C, respectively.  In Section A, we address the
threshold question how to proceed in the event that the Award is ambiguous.

### A.

Generally, "[a]n ambiguous award should be remanded to the arbitrators."
*Domino Grp.*, 985 F.2d at 420.  As discussed below, the Award was less than clear
on several points.  Arguably, then, the district court should have vacated the Award
and remanded to the arbitrator for clarification.  *But see Teamsters Loc. No. 579 v.
B & M Transit, Inc.*, 882 F.2d 274, 278 (7th Cir. 1989) ("When possible, . . . a court
should avoid remanding a decision to the arbitrator because of the interest in prompt

---

[1]As the district court noted, if in the future Hunt suspects that BNSF is in
breach of what the Award declared to be BNSF's section 3(a) obligations, then Hunt
should bring its claim to arbitration per the JSA's arbitration provision.  Assuming
the arbitrator agreed that BNSF had breached its contractual obligations, it would be
up to Hunt to convince the arbitrator to award specific performance rather than or in
addition to damages.  Only if and when an arbitrator awards specific performance, a
court confirms that award, and BNSF still refuses to perform would it be proper for
Hunt to initiate contempt proceedings.  Until then, BNSF would be in breach of, at
most, its contractual obligations, not a court order.

and final arbitration."); *Matrix Serv., Inc. v. Int'l Union of Operating Eng'rs, Loc. 150*, No. 05 CV 3618, 2005 WL 8179249, at \*1 (N.D. Ill. Nov. 22, 2005) ("[C]ourts may vacate arbitration awards only 'upon the application of any party to the arbitration.'" (emphasis omitted) (quoting 9 U.S.C. § 10(a))); *Van Erkis & Co. v. Solo Worldwide Enter.*, No. 98 CIV. 1385 (DLC), 2000 WL 423523, at \*2-3 (S.D.N.Y. Apr. 18, 2000) (same).

Even assuming the district court erred in confirming the Award, however, it would be inappropriate for us to vacate the confirmation because neither party appealed the issue. *See United States v. Sineneng-Smith*, 590 U.S. ---, 140 S. Ct. 1575, 1579 (2020) (explaining that courts should not "sally forth . . . looking for wrongs to right" but should instead "normally decide only questions presented by the parties"); *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 478-79 (1999) (holding that the appellate court erred in addressing those parts of the district court's orders that the parties did not appeal). Therefore, we do not disturb the confirmation of the Award.

Consequently, we must decide how to resolve ambiguity in the Award. The Federal Arbitration Act provides that, once confirmed, an award "shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action." 9 U.S.C. § 13; *see also Domino Grp.*, 985 F.2d at 420. Therefore, having concluded that we may not disturb the Award's confirmation, we must treat the Award as if it were a judgment issued by the district court. This means resolving any ambiguity in the Award by "constru[ing the Award] as a whole"; consulting the record if necessary; and, if the Award remains "susceptible of two interpretations," adopting the interpretation that "renders it the more reasonable, effective and conclusive." *See Harjo v. Empire Gas & Fuel Co.*, 28 F.2d 596, 598-99 (8th Cir. 1928) (explaining how to resolve ambiguity in a court judgment).

## B.

The parties' first interpretive dispute concerns whether the Award's equivalent-basis and comparable-service factors are exclusive. The district court concluded that they are not. Based on the plain text of the Award, however, we agree with Hunt that they are. In the Interim Ruling, the Panel ordered the parties to attempt to settle their longstanding dispute about "the specific criteria that define 'comparable service.'" "In the event that the parties are unable to agree," the Panel continued, "[t]he Panel will resolve the matter in its final award." The parties were unable to agree. Accordingly, after noting that the parties also continued to disagree about the meaning of the phrase "equivalent or at least as favorable basis," the Panel declared in its Final Ruling that it "must determine [for the parties] what constitutes an 'equivalent or at least as favorable basis' and 'comparable service' for purposes of JSA Section 3(a)." The Panel's use of "define" rather than "partially define" and "constitutes" rather than "partially constitutes" indicates that it intended the factors it enumerated to be exclusive.

Moreover, even if the Award's text were ambiguous, we would reach the same conclusion by considering "the entire record" and, if all else failed, adopting the interpretation that renders the Award more "reasonable, effective and conclusive." *See Harjo*, 28 F.2d at 599. The record indicates that part of what drove the parties' dispute was Hunt's concern that BNSF was narrowing what constitutes "comparable service" to avoid having to disclose favorable rates to Hunt. The Award could not have "resolve[d]" this dispute unless it enumerated an exclusive list of factors that precluded BNSF from adding more. Therefore, the record supports Hunt's position that the Award's lists of factors are exclusive. And even if the record were neutral, Hunt's interpretation would still render the Award more "effective and conclusive" than BNSF's interpretation. *See id.*

-10-

C.

The parties' second interpretive dispute concerns which Rate Offers the Panel held section 3(a) obligates BNSF to disclose and permit Hunt to use in lieu of the Revenue Split. Hunt argues that the Panel held that section 3(a) obligates BNSF to disclose to Hunt every Rate Offer that BNSF extends to another truckload carrier and to permit Hunt to use those which are for comparable service. BNSF argues, and the district court agreed, that the Panel held that section 3(a) obligates BNSF to disclose and permit Hunt to use only those Rate Offers that are for comparable service and that come with rates that are lower than BNSF's share of the Revenue Split. In addition, BNSF appears to argue that its section 3(a) obligations are conditioned on Hunt providing BNSF with sufficient information to determine which Rate Offers meet these criteria. We adopt a middle-ground position.

1.

Hunt rests its position on the following passage in the Final Ruling:

> BNSF argued that, as a predicate to its compliance with its Section 3(a) obligations to provide rates to HUNT, HUNT must first provide to BNSF the rates that HUNT quotes or provides to JSA customers, including all of the information that BNSF claims is necessary for it to determine if the rates it quotes to other truckload motor carriers are lower than the revenue divisions it receives from HUNT for JSA movements or other agreed-upon rates applicable to JSA shipments. Section 3(a) of the JSA does not expressly contain any such requirement, nor is BNSF's obligation to make rates available to HUNT thereunder expressly predicated upon HUNT providing any such information or on whether such rates are lower than the revenue divisions BNSF receives . . . .

According to Hunt, this passage holds that Hunt's provision of information regarding JSA shipments is not a condition for BNSF's section 3(a) obligation to permit Hunt to use Rate Offers extended to other truckload carriers for comparable service. As

Hunt points out, however, BNSF cannot know which Rate Offers are for comparable service unless Hunt supplies BNSF with information about the orders that Hunt is fulfilling. Therefore, Hunt argues, BNSF must be prepared to comply with its section 3(a) obligations despite not knowing which Rate Offers are for comparable service. And Hunt maintains that the only way for BNSF to do this is to disclose to Hunt every Rate Offer that BNSF extends to another truckload carrier. Thus, while conceding that it is entitled to use only those Rate Offers that are for comparable service, Hunt concludes that the Panel held that section 3(a) obligates BNSF to disclose to Hunt every Rate Offer.

2.

BNSF relies on the Interim Ruling to support its position. There, the Panel accepted the conclusions of a prior panel that had adjudicated a dispute between the parties in 2005. The 2005 panel found that, on at least one occasion, BNSF had failed to make available to Hunt a Rate Offer for comparable service that came with a rate that was lower than BNSF's share of the Revenue Split. But the 2005 panel also noted that because Hunt "did not notify BNSF when it established [JSA] rates," BNSF had no way of knowing which rates were lower than its share of the Revenue Split. The 2005 panel did not hold that BNSF was therefore obligated to disclose to Hunt every Rate Offer that BNSF extended to another truckload carrier to ensure that Hunt did not miss out on a Rate Offer to which it was entitled. On the contrary, the 2005 panel denied that the JSA imposed "duties to monitor, enforce or report the status of ongoing rate structures/offers made by either party to its customers." Instead, the 2005 panel held that Hunt is "the party in the best position" to ensure that it does not miss out on a Rate Offer to which it is entitled by "advising BNSF of the J.B. Hunt-quoted JSA rates . . . or coordinating rate making and quoting with BNSF." Accordingly, the 2005 panel declined to hold BNSF liable for its failure to make available to Hunt a Rate Offer for comparable service that came with a rate that was lower than BNSF's share of the Revenue Split. Thus, the 2005 panel apparently interpreted section 3(a) to obligate BNSF to disclose and permit Hunt to use only those Rate Offers that are for comparable service and that come with rates

-12-

that are lower than BNSF's share of the Revenue Split, and only on the condition that Hunt provides BNSF with sufficient information to determine which Rate Offers meet these criteria.

In the Interim Ruling, the Panel not only stated that it accepted the 2005 panel's conclusions but also defended those conclusions on the merits. The Panel agreed with BNSF that section 1 of the JSA obligates Hunt to provide sufficient information "for BNSF to determine what is 'comparable service'" and when it is "granting a lower rate" to another truckload carrier. The Panel explained that it is "[b]ecause Hunt . . . historically may not have complied fully with Section 1's requirements" that "BNSF is left to guess at whether, when it makes a rate available to another truckload motor carrier, that rate might be lower than the JSA revenue division." These remarks suggest that the Panel agreed with the 2005 panel that BNSF's section 3(a) obligations are conditioned on Hunt providing sufficient information for BNSF to determine which Rate Offers are for comparable service and come with rates that are lower than BNSF's share of the Revenue Split.

3.

The parties' arguments expose a genuine ambiguity in the Award. The first step toward resolving this ambiguity is to read the passages cited by the parties together, harmonizing them where it is possible to do so and, where it is not, looking for indicators of which passage is controlling. *See Harjo*, 28 F.2d at 599 (explaining that ambiguity in a court judgment is to be resolved by construing the judgment as a whole).

To an extent, it is possible to harmonize the two passages. In the Final Ruling, the Panel noted BNSF's argument that its section 3(a) obligations are conditioned on Hunt providing "the rates that HUNT quotes or provides to JSA customers, including all of the information that BNSF claims is necessary for it to determine if the rates it quotes to other truckload motor carriers are lower than the revenue divisions BNSF receives." The Panel then held that "BNSF's obligation to make

-13-

rates available to HUNT" under section 3(a) is not "expressly predicated upon HUNT providing any such information." Hunt reads "any such information" to mean any information at all about the JSA shipments. But it is more plausible to read "any such information" to mean "the information . . . necessary for [BNSF] to determine if the rates it quotes to other truckload motor carriers are lower than the revenue divisions BNSF receives." On this reading, the Final Ruling is consistent with the proposition—which the Interim Ruling appeared to endorse—that BNSF's section 3(a) obligations are conditioned on Hunt providing the information necessary for BNSF to determine which Rate Offers are *for comparable service*.

Although this reading minimizes the conflict between the passages, it does not eliminate it altogether. Two points of conflict remain. The first is whether BNSF must disclose and permit Hunt to use a given Rate Offer only if the Rate Offer comes with a rate that is lower than BNSF's share of the Revenue Split. The second is whether BNSF must disclose and permit Hunt to use a given Rate Offer only if Hunt provides BNSF with sufficient information for BNSF to know whether the Rate Offer comes with a rate that is lower than BNSF's share of the Revenue Split.

Accordingly, we look for textual and structural indicators of which passage is controlling on these points. Comparison of the passages' text supports treating the language in the Final Ruling as controlling. The Interim Ruling merely *implied* that BNSF must disclose and permit Hunt to use a given Rate Offer only if the Rate Offer comes with a rate that is lower than BNSF's share of the Revenue Split and Hunt provides sufficient information for BNSF to know that this is the case. The Final Ruling's indication to the contrary was much more explicit. In addition, the structure of the Award supports treating the language in the Final Ruling as controlling. Although the Final Ruling did incorporate the Interim Ruling, the Final Ruling was issued later and represents the Panel's final word on the matter. Therefore, we treat the language in the Final Ruling as controlling on these points.

Consequently, we can rule out BNSF's position that section 3(a) obligates it to disclose and permit Hunt to use only those Rate Offers for comparable service

that come with rates that are lower than BNSF's share of the Revenue Split. BNSF's position is inconsistent with the Final Ruling's statement, which we have decided is controlling, that BNSF's section 3(a) obligations "to make rates available to HUNT" are not predicated upon "whether such rates are lower than the revenue divisions BNSF receives."

That said, nothing in the Final Ruling requires going so far as to adopt Hunt's position that section 3(a) obligates BNSF to disclose *every* Rate Offer that BNSF extends to another truckload carrier and then permit Hunt to use any that is for comparable service. Hunt's argument for this position rests on the premise that BNSF's section 3(a) obligations are not conditioned on Hunt providing any information at all about the JSA shipments. But we have rejected this premise, concluding that it is plausible to interpret the Final Ruling in a way that is consistent with the Interim Ruling's implicit endorsement of the proposition that BNSF's section 3(a) obligations are conditioned on Hunt providing sufficient information for BNSF to determine which Rate Offers are for comparable service.

Indeed, given that the Final Ruling does not say otherwise, the Interim Ruling allows us to rule out Hunt's position too. According to the Interim Ruling, the JSA does not require either party to "report the status of ongoing rate structures/offers made by either party to its customers." Hunt's position that BNSF must disclose every Rate Offer that it extends to another truckload carrier is inconsistent with this statement.

Having ruled out the parties' positions on the extremes, we conclude that the Panel adopted a position somewhere in the middle. Unfortunately, the Panel failed to make clear precisely where in the middle this position was. Accordingly, because the Award remains "susceptible of [multiple] interpretations" even after "constru[ing it] as a whole," we must resolve the residual ambiguity in whichever way renders the Award most "reasonable, effective and conclusive." *See Harjo*, 28 F.2d at 599.

-15-

The interpretation that we conclude renders the Award most reasonable is one that comports with its other holdings. When analyzing the meaning of "on an equivalent or at least as favorable basis," the Panel identified eight factors, in addition to the rate itself, that determine how "favorable" a Rate Offer is. A Rate Offer that comes with a rate that is higher than BNSF's share of the Revenue Split might be more favorable to Hunt than the Revenue Split on one of these factors. For example, that Rate Offer might come with free empty-repositioning services that would not otherwise be available to Hunt under the JSA. If Hunt could purchase empty-repositioning services from BNSF for less than the difference between BNSF's share of the Revenue Split and the rate associated with the Rate Offer, then Hunt would be better off opting for the Revenue Split no matter how much it values empty repositioning. But if Hunt would have to pay BNSF more for empty-repositioning services than the difference between BNSF's share of the Revenue Split and the rate associated with the Rate Offer, then whether Hunt is better off opting for the Revenue Split depends on how much it values empty repositioning. In that case, as Hunt points out, BNSF cannot know whether, from Hunt's perspective, the Rate Offer is more favorable overall than the Revenue Split unless BNSF presents the Rate Offer to Hunt and lets Hunt decide. It would make little sense if the Panel nonetheless held that section 3(a) allows BNSF not to disclose or permit Hunt to use the Rate Offer.

That said, the fact that BNSF must disclose some Rate Offers for comparable service that come with rates that are higher than BNSF's share of the Revenue Split does not mean that BNSF must disclose all Rate Offers for comparable service. Presumably, the reason why the 2005 panel and the Interim Ruling limited BNSF's section 3(a) obligations to disclosing and permitting Hunt to use Rate Offers that come with rates that are lower than BNSF's share of the Revenue Split is that one way to discharge an obligation to make a rate available on an equivalent *or at least as favorable* basis is to make a rate available on even better terms. On this view, if BNSF can ascertain without consulting Hunt that the Revenue Split—the functional equivalent of a Rate Offer—is more favorable overall than every Rate Offer that BNSF extends to another truckload carrier for comparable service, then permitting

Hunt to use the Revenue Split discharges BNSF's section 3(a) obligations. By permitting Hunt to use the Revenue Split, BNSF would effectively be making the rates offered to other truckload carriers available to Hunt on a more favorable basis. We find this view reasonable, and it comports with the Final Ruling, which merely clarified that being more favorable in one respect does not entail being more favorable overall.

Thus, to determine whether it must disclose and permit Hunt to use a given Rate Offer for comparable service, BNSF must compare the Rate Offer with the Revenue Split. If the Revenue Split is at least as favorable overall as the Rate Offer no matter how Hunt values the equivalent-basis factors, then BNSF need not disclose or permit Hunt to use the Rate Offer. This will be the case if, by opting for the Revenue Split, Hunt can get at equal or less cost everything that it could get under the Rate Offer. Otherwise, BNSF must either disclose and permit Hunt to use the Rate Offer or make Hunt another Rate Offer that does give Hunt, at equal or less cost, everything that the former Rate Offer would give it.

In sum, we hold that BNSF's section 3(a) obligations under the Award are as follows. If Hunt fails to provide sufficient information for BNSF to determine which Rate Offers are for comparable service, then BNSF need not disclose or permit Hunt to use any Rate Offers in lieu of the Revenue Split. Otherwise, BNSF must disclose and permit Hunt to use a given Rate Offer if and only if (1) the Rate Offer is one that BNSF extended to another truckload carrier for comparable service; and (2) the Rate Offer would give Hunt something that Hunt could not get already, at equal or less cost, by opting for the Revenue Split or another Rate Offer that BNSF has extended to Hunt.

## IV.

For the foregoing reasons, we affirm the district court's denial of Hunt's motion for "enforcement" insofar as it was a request for an order of specific performance, we affirm in part and reverse in part the district court's denial of Hunt's

motion for "enforcement" insofar as it was a request for a declaratory judgment, and we remand for entry of a declaratory judgment consistent with this opinion.

_____