# United States Court of Appeals

## For the Eighth Circuit

_____

No. 20-2460

_____

Charles E. Sisney

*Plaintiff - Appellee*

v.

Denny Kaemingk, in his official capacity as the South Dakota Secretary of Corrections; Darrin Young, in his official capacity as the Warden of the South Dakota State Penitentiary; Sharon Reimann, in her official capacity as an SDSP designated Mailroom Officer; Craig Mousel, in his official capacity as an SDSP designated Property Officer

*Defendants - Appellants*

------------------------------

National Coalition Against Censorship

*Amicus on Behalf of Appellee(s)*

_____

Appeal from United States District Court
for the District of South Dakota - Southern

_____

Submitted: June 17, 2021
Filed: October 15, 2021

_____

Before GRUENDER, BENTON, and STRAS, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Charles E. Sisney brought as-applied and facial challenges to the South Dakota State Penitentiary's pornography policy (the "Policy") under the First and Fourteenth Amendments, naming as defendants four South Dakota corrections officials in their official capacities. The district court granted in part and denied in part the parties' motions for summary judgment, and the defendants appeal. We affirm in part and reverse in part.

**I.**

Sisney is an inmate at the South Dakota State Penitentiary. In 2015, prison officials rejected several items in Sisney's incoming mail. These items included four issues of a comic-book series entitled *Pretty Face*; a reprint of the iconic Coppertone advertisement featuring a puppy pulling at a little girl's swim bottoms; two erotic novels, *Thrones of Desire* and *Pride and Prejudice: The Wild and Wanton Edition*; a fine-art book entitled *Matisse, Picasso and Modern Art in Paris*; and nine pictures of Renaissance artwork featuring nudity, including Michelangelo's "David" and the Sistine Chapel. Prison officials based their decision to reject these items on the Policy, which prohibits inmates from receiving pornographic material. The Policy defines "pornographic material" as follows:

> Includes books, articles, pamphlets, magazines, periodicals, or any other publications or materials that feature nudity or "sexually explicit" conduct. Pornographic material may also include books, pamphlets, magazines, periodicals or other publications or material that features, or includes photographs, drawings, etchings, paintings, or other graphic depictions of nudity or sexually explicit material.

> "Nudity" means a pictorial or other graphic depiction where male or female genitalia, pubic area, buttocks or female breasts are exposed. Published material containing nudity illustrative of medical, educational or anthropological content may be excluded from this definition.

"Sexually Explicit" includes written and/or pictorial, graphic depiction of actual or simulated sexual acts, including but not limited to sexual intercourse, oral sex or masturbation. Sexually explicit material also includes individual pictures, photographs, drawings, etchings, writings or paintings of nudity or sexually explicit conduct that are not part of a book, pamphlet, magazine, periodical or other publication.

After exhausting his administrative remedies, Sisney sued the defendants in federal court, claiming that the Policy was unconstitutionally overbroad on its face and, in any event, unconstitutional as applied to the items enumerated above. Both parties moved for summary judgment. The district court held that the Policy was unconstitutionally overbroad on its face and then appeared to adjudicate Sisney's as-applied challenges against a prior version of the Policy. *See Sisney v. Kaemingk*, CIV 15-4069, 2016 WL 5475972 (D.S.D. Sept. 29, 2016), *vacated*, 886 F.3d 692 (8th Cir. 2018).

On appeal, a panel of this court vacated the district court's summary-judgment order and remanded. *Sisney v. Kaemingk* (*Sisney I*), 886 F.3d 692, 694 (8th Cir. 2018). We explained that the proper course under *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469 (1989), was first to resolve Sisney's as-applied challenges against the version of the Policy in effect and then to consider Sisney's overbreadth challenge only if at least one of Sisney's as-applied challenges failed. *Sisney I*, 886 F.3d at 698-99.

On remand, the district court rejected Sisney's as-applied challenges to the *Pretty Face* comics and the Coppertone advertisement but sustained Sisney's as-applied challenges to the other items. Turning to Sisney's overbreadth challenge, the district court concluded that the Policy was overbroad but that it was possible to remedy its constitutional defects without enjoining its enforcement *in toto*. The district court explained that the Policy remained enforceable to the extent that it overlapped with a hypothetical amended version of the Policy that the district court drafted. The district court's amended definition of "pornographic material" reads as follows, with deletions in ~~strikethrough~~ and insertions in underline:

Includes books, articles, pamphlets, magazines, periodicals, or any other publications or materials that feature ~~nudity or~~ "sexually explicit" conduct. Pornographic material may also include books, pamphlets, magazines, periodicals or other publications or material that features~~,~~ ~~or includes~~ photographs, drawings, etchings, paintings, or other graphic depictions of ~~nudity or~~ sexually explicit material. <u>Featured: is defined as a publication which routinely and regularly featured pornography, or in the case of one-time issues, promoted itself based on pornographic content. The depiction of nudity of minors is prohibited.</u>[1]

"Nudity" means a pictorial or other graphic depiction where male or female genitalia, pubic area, buttocks or female breasts are exposed. Published material containing nudity illustrative of medical, educational or anthropological content may be excluded from this definition.

"Sexually Explicit" includes written and/or pictorial, graphic depiction of actual or simulated sexual acts, including but not limited to sexual intercourse, oral sex or masturbation. Sexually explicit material also includes individual pictures, photographs, drawings, etchings, writings or paintings of ~~nudity or~~ sexually explicit conduct that are not part of a book, pamphlet, magazine, periodical or other publication.

The *Pretty Face* comics and the Coppertone advertisement fell within the scope of this hypothetical amended version of the Policy. Therefore, because the district court enjoined enforcement of the Policy only to the extent that it did not overlap with this hypothetical amended version, the district court's remedy for the Policy's alleged overbreadth did not affect which of the challenged materials Sisney would be permitted to receive.

---

[1] The district court's order included two formulations of its definition of "featured" or "feature" and its provision regarding nudity of minors. One is reproduced above; the other reads as follows: "'Feature' means a publication which routinely and regularly featured pornography, or in the case of one-time issues, promoted itself based on pornographic content. Graphic depictions of nudity of minors is [sic] prohibited." Our analysis does not depend on which formulation is controlling.

The defendants appealed, challenging the district court's adverse rulings on Sisney's as-applied challenges and the district court's conclusion that the Policy was overbroad. The defendants did not appeal the district court's remedy for the alleged overbreadth. Nor did Sisney, who did not file a cross-appeal, even though he had urged the district court to enjoin enforcement of the Policy *in toto* after concluding that it was overbroad.

After filing their notice of appeal, the defendants asked us to stay the district court's order. We denied this request. Alleging that the defendants have nevertheless refused to comply with the district court's order, Sisney has filed two motions asking us to sanction the defendants for contempt of court.

## II.

We review the district court's grant of summary judgment *de novo*. *Sisney I*, 886 F.3d at 697.[2] "When a prison regulation impinges on inmates' constitutional

[2]Under the doctrine of *Pullman* abstention, we sometimes stay ruling on a state law's constitutionality "pending determination in state court of state-law issues central to the constitutional dispute." *See Moore v. Sims*, 442 U.S. 415, 427-28 (1979). *Pullman* abstention "does not require that [the court] defer to the wishes of the parties," *Ohio Bureau of Emp't Servs. v. Hodory*, 431 U.S. 471, 480 n.11 (1977), and may be raised by the court *sua sponte*, *Bellotti v. Baird*, 428 U.S. 132, 143 n.10 (1976). That said, *Pullman* abstention is a "limited" exception to the "virtually unflagging obligation" that federal courts have "to exercise their jurisdiction in proper cases." *Beavers v. Ark. State Bd. of Dental Exam'rs*, 151 F.3d 838, 840-41 (8th Cir. 1998). It is especially "disfavored" when the plaintiff is bringing a facial challenge to a state law under the First Amendment. *Id.* at 841; *see also City of Houston v. Hill*, 482 U.S. 451, 467-48 (1987) ("[W]e have been particularly reluctant to abstain in cases involving facial challenges based on the First Amendment."). And although a court may invoke *Pullman* abstention against the parties' wishes, the fact that "neither party requested it" and "the litigation ha[s] already been long delayed" weighs against doing so. *See Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 329 (1964). Here, the parties have been litigating Sisney's First Amendment challenges since 2015 and have not asked for abstention. Accordingly, we decline to invoke *Pullman* abstention in this case.

rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). The Supreme Court has articulated a two-step, four-factor test to determine when a regulation that impinges on inmates' constitutional rights is "reasonably related to legitimate penological interests." *Id.* The first factor operates as a threshold condition that the regulation must satisfy to pass constitutional muster. *See Amatel v. Reno*, 156 F.3d 192, 196 (D.C. Cir. 1998). Assuming the regulation satisfies this threshold requirement, the court must determine the regulation's constitutionality by balancing the remaining three factors. *See id.* at 201-03.

The first factor is that "there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (internal quotation marks omitted). When the regulation in question "restrict[s] inmates' First Amendment rights," then it must also "operate[] in a neutral fashion" to further this interest. *Id.* at 90. This means that the proffered mechanism by which the regulation promotes the legitimate government interest must be "unrelated to the suppression of expression." *See Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989). For example, although "inmate rehabilitation" is a legitimate government interest, *Dawson v. Scurr*, 986 F.2d 257, 261 (8th Cir. 1993), a prison may not censor "literature advocating racial purity" on the ground that exposure to racist ideas inhibits rehabilitation, *McCabe v. Arave*, 827 F.2d 634, 638 (9th Cir. 1987). But a prison may censor depictions of nude or scantily clad minors on the ground that consumption of such images inhibits rehabilitation of sex offenders, not by exposing them to corrupting ideas, but by feeding their desires to perform criminal acts. *See, e.g.*, *Ahlers v. Rabinowitz*, 684 F.3d 53, 58, 65 (2d Cir. 2012) (holding that the government interest in rehabilitating prisoners convicted of sexually abusing minors justified withholding "images of children in bathing suits").

Generally, the prison bears the burden of proving the existence of a "rational connection" between the challenged regulation and a legitimate government interest. *See Murchison v. Rogers*, 779 F.3d 882, 887-88 (8th Cir. 2015). This does not require proving that "the regulation in fact advances the government interest," but it

does require proving that the policymaker "might reasonably have thought that it would." *Amatel*, 156 F.3d at 199. Unless a rational connection between the regulation and the asserted interest is a matter of "common sense," *id.*, the prison "must proffer some evidence to support" the existence of such a connection, *Shimer v. Washington*, 100 F.3d 506, 509-10 (7th Cir. 1996). *See also Turner*, 482 U.S. at 97-99 (holding a regulation unconstitutional after noting that the prison "pointed to nothing in the record suggesting" the existence of a rational connection between the regulation and the asserted government interest and that "[c]ommon sense likewise suggests that there is no [such] connection").

The "second factor . . . is whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. The Supreme Court has held that this factor weighs in favor of the constitutionality of a prison's regulation of incoming mail if the regulation "permit[s] a broad range of publications to be sent, received, and read." *Thornburgh*, 490 U.S. at 417-18.

The "third consideration is the impact [that] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. This factor weighs in favor of the constitutionality of a regulation censoring material that would inhibit some inmates' rehabilitation and that "would likely be disseminated" throughout the prison. *See Dawson*, 986 F.2d at 262; *Amatel*, 156 F.3d at 201 ("Even if pornography could be directed only to those not likely to be adversely affected, it could find its way to others, interfering with their rehabilitation and increasing threats to safety.").

"Finally, the absence of ready alternatives [to the regulation] is evidence of the reasonableness of a prison regulation." *Turner*, 482 U.S. at 90. "By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Id.* (internal quotation marks omitted).

Here, the defendants do not deny that the First Amendment, incorporated against the states through the Fourteenth Amendment, generally protects the right to possess many of the materials that the Policy censors, including the materials that Sisney sought. There is no dispute, then, that the Policy triggers *Turner*'s test by "imping[ing] on inmates' constitutional rights," *Turner*, 482 U.S. at 89, and Sisney's constitutional rights in particular. Accordingly, we apply *Turner*'s test to Sisney's claims.

### III.

We begin with Sisney's as-applied challenges, *see Sisney I*, 886 F.3d at 698-99, considering each of the contested materials in turn and asking "whether a ban on *th[at] particular item[]* is reasonably related to a legitimate penological objective," *Murchison*, 779 F.3d at 887. Because Sisney did not cross-appeal, we consider only those of Sisney's as-applied challenges that the district court sustained on summary judgment; namely, those that concerned *Thrones of Desire*; *Pride and Prejudice: The Wild and Wanton Edition*; *Matisse, Picasso and Modern Art in Paris*; and the nine pictures of Renaissance artwork.

### A.

We begin with the two erotic novels. In *Carpenter v. South Dakota*, 536 F.2d 759, 762-63 (8th Cir. 1976), we held that it was "well within the discretion" of prison officials under *Procunier v. Martinez*, 416 U.S. 396 (1974), *overruled by Thornburgh*, 490 U.S. 401, to censor material whose "primary purpose" was sexual arousal because such material "would have a detrimental effect upon rehabilitation." *Martinez*'s test was "less deferential" than the test from *Turner* that replaced it. *Thornburgh*, 490 U.S. at 409-13. Therefore, *Carpenter*'s holding that *Martinez* permits prison officials to censor material whose primary purpose is sexual arousal implies that *Turner* too permits prison officials to censor material whose primary purpose is sexual arousal. Furthermore, *Thornburgh* held that *Turner* permits prisons to take an "all-or-nothing" approach to censorship, prohibiting books in their

-8-

entirety if they contain any censorable content. *Id.* at 418-19. In conjunction, then, *Carpenter* and *Thornburgh* entail that prisons may censor books in their entirety if they contain material whose primary purpose is sexual arousal. Both erotic novels at issue here contain graphic descriptions of sexual acts whose primary purpose is clearly to cause sexual arousal in the reader.[3] Therefore, the Policy is constitutional as applied to these books in their entirety.

Furthermore, even if *Carpenter* and *Thornburgh* did not control the resolution of Sisney's challenges to the Policy as applied to the erotic novels, we would reach the same conclusion by conducting an independent analysis of *Turner*'s four factors.

As applied to the erotic novels, the Policy clears *Turner*'s threshold requirement. Courts have routinely held that there is a rational connection between censoring pornography and promoting legitimate penological interests. *See, e.g.*, *Mauro v. Arpaio*, 188 F.3d 1054, 1059-60 (9th Cir. 1999) (en banc); *Amatel*, 156 F.3d at 196-201. True, many of these cases concern bans on pornographic images. *See, e.g.*, *Amatel*, 156 F.3d at 194. *But see Cline v. Fox*, 266 F. Supp. 2d 489, 493-501 (N.D. W. Va. 2003) (rejecting an as-applied challenge to the censorship of a pornographic writing); *Snelling v. Riveland*, 983 F. Supp. 930, 935-37 (E.D. Wash. 1997), *aff'd*, 165 F.3d 917 (9th Cir. 1998) (rejecting a challenge to a ban that

---

[3]The Amazon.com advertisement for *Pride and Prejudice: The Wild and Wanton Edition*, which is in the record, describes the book as follows:

> [W]e've never been able to see Elizabeth and Fitzwilliam *in flagrante delicto*—until now. In this deliciously naughty updating of the beloved classic, you can peek behind the closed doors of Pemberley's sexiest master bedroom—and revel in the sexual delights of your favorite couple. From first kiss to orgasmic finish, this book is every Austen fan's dream come true—the story you love, with the heat turned up to high. It will come as no surprise that the dashing Mr. Darcy is as passionate and intense with his knickers off as he is with them on.

The record also includes an excerpt from *Thrones of Desire*, which we do not reprint here, that describes in detail a series of masturbations.

extended to pornographic writings). Nonetheless, common sense confirms that pornographic writings such as the two at issue here can present the same obstacles to legitimate penological interests as pornographic images. *See Cline*, 266 F. Supp. 2d at 497-98 (finding "a common sense nexus" between prohibiting a book with graphic but exclusively "verbal" descriptions of sexual acts and "legitimate penological purposes"). Furthermore, the defendants' censorship of the erotic novels because of their sexually explicit content "operated in a neutral fashion." *See Turner*, 482 U.S. at 90. Prison officials did not censor the books because they advanced claims about human sexuality that the prison officials deemed subversive and therefore worthy of suppression. Instead, prison officials censored the books because they contained passages "intended to serve no other purpose than to arouse the sexual desires of those reading the book."

Given that *Turner*'s threshold requirement is met, we apply *Turner*'s remaining three factors. All three weigh in the defendants' favor. *Turner*'s second factor weighs in the defendants' favor because censoring the erotic novels is consistent with "permit[ting] a broad range of publications to be sent, received, and read." *See Thornburgh*, 490 U.S. at 418. *Turner*'s third factor weighs in the defendants' favor because sexually explicit material is likely to find its way through bartering to the prisoner who finds it most sexually stimulating, potentially interfering with rehabilitation. *See id.*; *Dawson*, 986 F.2d at 262; *Amatel*, 156 F.3d at 201. And *Turner*'s fourth factor weighs in the defendants' favor because alternatives such as page-by-page censorship and monitored reading rooms are not "obvious, easy alternatives." *See Thornburgh*, 490 U.S. at 418-19.

Thus, we conclude that the district court erred in granting summary judgment for Sisney on his claim that the Policy is unconstitutional as applied to *Thrones of Desire* and *Pride and Prejudice: The Wild and Wanton Edition*. Whether under *Carpenter* and *Thornburgh* or under an independent application of *Turner*, the defendants were within their discretion to censor these books.

B.

We reach the opposite conclusion regarding Sisney's challenge to the Policy as applied to *Matisse, Picasso and Modern Art in Paris* and the nine pictures of Renaissance artwork. As the district court observed, *Matisse, Picasso and Modern Art in Paris* "is simply an art book." Although a few of the featured works include nudity, the defendants have identified none that even arguably depicts its subject "lewdly or as engaged in any actual or simulated sexual acts." The same is true of Michelangelo's "David," the Sistine Chapel, and the other works of art represented in the nine pictures that the defendants withheld from Sisney. Common sense does not suggest, and the defendants have offered no evidence to prove, a rational connection between banning pictures of artwork such as Michelangelo's "David" and legitimate government interests such as security and rehabilitation. *See Aiello v. Litscher*, 104 F. Supp. 2d 1068, 1080 (W.D. Wis. 2000) (denying prison officials' motion for summary judgment in part because they "failed to submit any credible evidence" of a rational connection between banning "great works of art" and promoting rehabilitation, "and common sense suggests none"). Therefore, the defendants' censorship of *Matisse, Picasso and Modern Art in Paris* and of the nine pictures of Renaissance artwork fails *Turner*'s threshold requirement. The district court properly granted summary judgment for Sisney on his claim that the Policy is unconstitutional as applied to these items.

**IV.**

Having resolved Sisney's as-applied challenges to the Policy, we turn to his facial challenge based on the claim that the Policy is overbroad.

A.

We begin by addressing the threshold question of subject-matter jurisdiction. Although neither the district court nor the parties raised this issue, "[w]e have an obligation to consider sua sponte both our jurisdiction and . . . the jurisdiction of the

-11-

district court." *See Thomas v. United Steelworkers Loc. 1938*, 743 F.3d 1134, 1138-39 (8th Cir. 2014).

The overbreadth doctrine "allow[s] litigants whose own speech could constitutionally be regulated to challenge overly broad regulations which affect them." *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 799 (8th Cir. 2006). "Under no circumstances, however, does the overbreadth doctrine relieve a plaintiff of [his] burden to show constitutional standing." *Id.* Nor does it permit a federal court to adjudicate an issue that has become moot. *See Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1311-12 (8th Cir. 1997) (dismissing an overbreadth challenge as moot). Both rules are jurisdictional. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 66-67 (1997). In fact, subject to caveats inapplicable here, *see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189-91 (2000), the difference between standing and mootness doctrines is merely one of "time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)," *Arizonans for Official English*, 520 U.S. at 68 n.22. This means, among other things, that a federal court lacks subject-matter jurisdiction to rule on an overbreadth challenge unless it is true right up until the court decides the question that a favorable decision would likely redress the plaintiff's injury by lifting the restriction on his speech. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (explaining that the likelihood "that the injury will be redressed by a favorable decision" is a necessary element of standing (internal quotation marks omitted)); *Advantage Media*, 456 F.3d at 801-02 (holding that a plaintiff bringing an overbreadth challenge lacked standing because a favorable decision would not allow the plaintiff to engage in the speech at issue).

A corollary of this conclusion is that a federal court lacks subject-matter jurisdiction to rule on an overbreadth challenge if it is possible to remedy the alleged overbreadth without enjoining enforcement of those parts of the law that apply to the plaintiff's speech. Generally, when confronting a constitutional problem in a law, courts should "limit the solution" by enjoining enforcement of "any problematic

portions while leaving the remainder intact." *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010) (internal quotation marks omitted); *see also New York v. Ferber*, 458 U.S. 747, 769 n.24 (1982) ("[I]f [an overbroad statute] is severable, only the unconstitutional portion is to be invalidated."). Sometimes a limited solution is not possible because it would "entail quintessentially legislative work" (in the case of a statute) or executive work (in the case of a regulation) that the Constitution does not empower federal courts to undertake. *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006); *Free Enter. Fund*, 561 U.S. at 509-10 (holding that to "blue-pencil" a statute would be to assume an "editorial freedom [that] belongs to the Legislature"). When that is the case, the court has no choice but to enjoin enforcement of the law *in toto*. *E.g.*, *Acosta v. City of Costa Mesa*, 718 F.3d 800, 812 (9th Cir. 2013) (per curiam). But when a more limited "judicial remedy" is available, the court should adopt it. *See Ayotte*, 546 U.S. at 329. And if this limited remedy would leave in effect those parts of the law that apply to the plaintiff's speech, then it would not redress the plaintiff's injury. *See Advantage Media*, 456 F.3d at 801-02 (concluding that a favorable decision on the plaintiff's overbreadth claim would not redress the plaintiff's injury because the challenged provisions were "properly considered severable" and the plaintiff's speech "would still violate other . . . provisions"). Therefore, if a court confronted with an overbreadth challenge decides that it would be possible to remedy the alleged overbreadth without enjoining enforcement of those parts of the law that apply to the plaintiff's speech, then it must dismiss the challenge for lack of subject-matter jurisdiction. *See id.* at 799-802; *accord Midwest Media Prop., L.L.C. v. Symmes Tp., Ohio*, 503 F.3d 456, 465 (6th Cir. 2007).[4]

---

[4]The dissent objects to this conclusion on the ground that it "puts the cart before the horse." *Post*, at 25. "Overbreadth is a merits question," and "severability is a remedies question," it explains, "and a court can only consider either after determining it has subject-matter jurisdiction." *Post*, at 25-26. We agree that ordinarily a court may consider merits or remedies questions only after confirming that it has subject-matter jurisdiction. *See, e.g.*, *Crawford v. F. Hoffman-La Roche Ltd.*, 267 F.3d 760, 764 (8th Cir. 2001). But sometimes a court cannot determine whether it has subject-matter jurisdiction without addressing questions that are also relevant to the merits or the remedy. *See Brownback v. King*, 592 U.S. ---, 141 S.

Here, the district court construed Sisney's *pro se* complaint as bringing a two-part overbreadth challenge alleging that the Policy's prohibition on nudity and the Policy's prohibition on sexually explicit content were both overbroad. By the time the district court considered this challenge on remand, it had already sustained all of Sisney's as-applied challenges except those that concerned the Coppertone advertisement and the *Pretty Face* comics. Sisney's only remaining injuries were thus being deprived of these two items. The district court then concluded that a limited judicial remedy for the alleged overbreadth in the prohibition on nudity was available that would not bar enforcement of the Policy against either item. Having reached this conclusion, the district court should have dismissed as moot Sisney's claim that the prohibition on nudity was overbroad on the ground that a favorable decision on this claim would not have redressed either of Sisney's remaining injuries. Similarly, the district court concluded that a limited judicial remedy for the alleged overbreadth in the prohibition on sexually explicit content was available that would not bar enforcement of the Policy against either the Coppertone advertisement or the *Pretty Face* comics. Again, having reached this conclusion, the district court should have dismissed as moot Sisney's claim that the prohibition on sexually explicit content was overbroad on the ground that a favorable decision on this claim would not have redressed either of Sisney's remaining injuries. In sum, the district

---

Ct. 740, 749 (2021) ("[M]erits and jurisdiction will sometimes come intertwined . . . ."). In that case, the court may—indeed, must—address these questions at the outset to determine whether it has subject-matter jurisdiction. *See, e.g.*, *Hillesheim v. Holiday Stationstores, Inc.*, 953 F.3d 1059, 1062 (8th Cir. 2020) (concluding that the case was moot because "injunctive relief is the only private relief available in a Title III case"); *Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789, 797-99 (8th Cir. 2010) (deciding whether a statute authorized monetary damages in order to determine whether the plaintiffs had standing); *Brownback*, 141 S. Ct. at 749-50 (explaining that "a court can decide . . . the merits issues" necessary to resolve a jurisdictional question because "a federal court always has jurisdiction to determine its own jurisdiction"); *Richardson v. BNSF Ry. Co.*, 2 F.4th 1063, 1068-69 (8th Cir. 2021) (concluding that there was subject-matter jurisdiction under the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, because the claim could be resolved under Federal Rule of Civil Procedure 12(b)(6) without interpreting the collective-bargaining agreement).

court should have dismissed as moot Sisney's overbreadth challenge in its entirety without reaching the merits.

Typically, when a district court enters judgment on a claim that it should have dismissed as moot, we vacate the judgment and remand with instructions to dismiss the claim for lack of subject-matter jurisdiction. *See, e.g.*, *Brazil v. Ark. Dep't of Human Servs.*, 892 F.3d 957, 960-61 (8th Cir. 2018). In this case, however, the matter is not so simple. What mooted Sisney's overbreadth challenge was the combination of (1) the district court's rulings on his as-applied challenges, which left him with only two remaining injuries, and (2) the district court's choice of remedy, which redressed neither one. Because neither party appealed the district court's choice of remedy, we do not review it. *See United States v. Sineneng-Smith*, 590 U.S. ---, 140 S. Ct. 1575, 1579 (2020) (explaining that courts should "normally decide only questions presented by the parties" instead of "sally[ing] forth . . . looking for wrongs to right"); *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 478-79 (1999) (holding that the appellate court erred in addressing parts of the district court's orders that the parties did not appeal); *J.B. Hunt v. BNSF Ry. Co.*, 9 F.4th 663, 670 (8th Cir. 2021) ("Even assuming the district court erred . . . , it would be inappropriate for us to [correct the error] because neither party appealed the issue."). But the defendants did appeal the district court's decision to sustain all of Sisney's as-applied challenges other than those that concerned the Coppertone advertisement and the *Pretty Face* comics. And, after reviewing this decision, we concluded that the district court erred with respect to the two erotic novels, *Thrones of Desire* and *Pride and Prejudice: The Wild and Wanton Edition*. *See supra* Section III.A. Before remanding with instructions to dismiss Sisney's overbreadth challenge as moot, then, we must determine whether it remains true that the challenge is moot now that two additional injuries have survived resolution of Sisney's as-applied challenges.

With respect to Sisney's claim that the prohibition on nudity is overbroad, the answer is "yes." A favorable decision on this claim would trigger the district court's remedy for the alleged overbreadth in the prohibition on nudity—again, not because

we would affirm this remedy were we to review it *de novo* but because neither party appealed it. The district court's remedy was to enjoin the enforcement of the prohibition on nudity except against nudity involving minors. But the defendants censored the erotic novels under the Policy's prohibition on sexually explicit content. Because the district court's remedy for the alleged overbreadth in the prohibition on nudity did not affect the prohibition on sexually explicit content, it would not bar enforcement of the Policy against either book. Thus, a favorable decision on Sisney's claim that the prohibition on nudity is overbroad would not redress any of Sisney's remaining injuries. Sisney's claim that the prohibition on nudity is overbroad is therefore moot.[5]

The same is not true about Sisney's claim that the prohibition on sexually explicit content is overbroad. A favorable decision on this claim would trigger the district court's remedy for the alleged overbreadth in the prohibition on sexually

_____

[5]The dissent argues that a case or controversy currently exists on this point because "[t]he aggrieved parties now are the *prison officials*, so the question for us is whether we can give *them* any effective relief if we decide the appeal in their favor." *Post*, at 26 (internal quotation marks and brackets omitted). We disagree. The requirement that the plaintiff's injury be redressable by a favorable resolution of his claim "subsists through all stages of federal judicial proceedings, trial and appellate." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998); *see also Whitfield v. Thurston*, 3 F.4th 1045, 1047 (8th Cir. 2021) (explaining that mootness "occurs when the requisite personal interest that gave the plaintiff standing to bring the suit disappears as the case proceeds" (internal quotation marks omitted)). We cannot evade this requirement in cases where the defendant lost before the district court by substituting the defendant's injury of having suffered an adverse judgment for the injury that gave the plaintiff standing to sue in the first place. *See, e.g.*, *Gillpatrick v. Frakes*, No. 4:18CV3011, 2019 WL 7037367, at *8 (D. Neb. June 7, 2019) (enjoining the enforcement of a prison policy), *vacated as moot*, 997 F.3d 1258 (8th Cir. 2021) (holding that the prison officials' appeal of the injunction was moot because the plaintiffs' injury was no longer redressable). To be sure, we may vacate the district court's judgment in such a case. *See Gillpatrick*, 997 F.3d at 1259. But redressing the adverse judgment against the defendant does not require—and in any event Article III does not permit—going beyond vacatur and reaching the merits, as the dissent would do here. *Compare id. with post*, at 27-28.

-16-

explicit content—once again, not because we would affirm this remedy on *de novo* review but because neither party appealed it. The district court's remedy involved enjoining the enforcement of the prohibition on sexually explicit content against any nonperiodical publication that does not "promote[] itself based on pornographic content." Unfortunately, the term "based on" is ambiguous. On one interpretation, a publication "promote[s] itself based on pornographic content" if its promotional materials allude to the fact that the publication contains pornographic content. On another interpretation, a publication "promote[s] itself based on pornographic content" only if its promotional materials themselves contain pornographic content. On the first interpretation, the district court's remedy would not bar enforcement of the Policy against *Pride and Prejudice: The Wild and Wanton Edition*, whose Amazon.com advertisement broadcasts the fact that it contains pornographic content, and it likely also would not bar enforcement of the Policy against *Thrones Desire*, whose book cover seeks to entice the reader with a picture of a scantily clad woman and a promise of "erotic tales" within. On the second interpretation, however, the district court's remedy likely would bar enforcement of the Policy against both books because there is no evidence of pornographic content in the books' promotional materials themselves. Given the district court's conclusion that the First Amendment protects both books, we presume that the district court understood its fine-tuned remedy for the Policy's overbreadth to bar enforcement of the Policy against both books. Accordingly, we adopt the second interpretation of the district court's remedy and conclude that a favorable decision on Sisney's claim that the prohibition on sexually explicit content is overbroad would likely redress Sisney's injuries of being deprived of the erotic novels. Sisney's claim that the prohibition on sexually explicit content is overbroad is therefore not moot.

Thus, we will remand with instructions to dismiss as moot Sisney's claim that the prohibition on nudity is overbroad. But Sisney's claim that the prohibition on sexually explicit content is overbroad remains a live case or controversy thanks to our reversal of the district court's ruling on his as-applied challenges regarding the erotic novels. Consequently, were we to vacate and remand on this claim, we would need to instruct the district court to reach the merits for a second time. And this

would be a futile exercise because the district court has already indicated that it agrees with Sisney that the prohibition on sexually explicit content is overbroad. Accordingly, rather than necessitate a third appeal in this case, we settle the matter here. *See Crown Cork & Seal Co. v. Int'l Ass'n of Machinists & Aerospace Workers*, 501 F.3d 912, 916 (8th Cir. 2007) (deciding a question on appeal rather than remanding because "remand would be inefficient and unnecessary").

B.

Unlike a typical facial challenge, which requires showing that "no set of circumstances exists under which" the law could be constitutionally applied, a First Amendment overbreadth challenge requires showing only that "a substantial number of [the law's] applications are unconstitutional, judged in relation to [the law's] plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472-73 (2010). "The first step in overbreadth analysis is to construe the challenged [law]; it is impossible to determine whether a [law] reaches too far without first knowing what the [law] covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). Just as this court does with respect to federal laws, *see, e.g.*, *Union Pac. R.R. v. U.S. Dep't of Homeland Sec.*, 738 F.3d 885, 892-93 (8th Cir. 2013); *Chu Drua Cha v. Noot*, 696 F.2d 594, 596 (8th Cir. 1982), the South Dakota Supreme Court construes South Dakota laws in accordance with the doctrine of constitutional avoidance, which requires adopting a construction of a law that avoids questions about its constitutionality if such a construction is "fairly possible," *see State v. Big Head*, 363 N.W.2d 556, 559 (S.D. 1985). Generally, we construe a state's laws according to that state's principles of construction. *E.g.*, *Behlmann v. Century Sur. Co.*, 794 F.3d 960, 963 (8th Cir. 2015). Whether this case is an exception depends on whether the First Amendment precludes applying the doctrine of constitutional avoidance in the context of an overbreadth challenge.

We conclude that it does not. We recognize that the Fifth Circuit has suggested otherwise, attributing to the U.S. Supreme Court a "decision not to rely upon the canon of constitutional avoidance in the overbreadth context." *See Serafine*

*v. Branaman*, 810 F.3d 354, 369 (5th Cir. 2016) (internal quotation marks omitted) (citing *Stevens*, 559 U.S. at 481); *cf. Turchik v. United States*, 561 F.2d 719, 723-24 (8th Cir. 1977) (stating in *dicta* that "the preferred position of the First Amendment greatly weakens" the doctrine of constitutional avoidance in the context of an overbreadth challenge). But we respectfully disagree with the Fifth Circuit's reading of *Stevens*, where the Supreme Court merely asserted the unremarkable proposition that the doctrine of constitutional avoidance is not a license to "rewrite a . . . law to conform it to constitutional requirements," 559 U.S. at 481, a proposition that it has also recited outside the First Amendment context, *see, e.g.*, *Seila Law LLC v. CFPB*, 591 U.S. ---, 140 S. Ct. 2183, 2207 (2020). In fact, the Supreme Court has explicitly endorsed the doctrine of constitutional avoidance in the context of overbreadth challenges. *Osborne v. Ohio*, 495 U.S. 103, 119-20 (1990) (rejecting the "content[ion] that . . . a court may not construe [a] statute to avoid [First Amendment] overbreadth problems" and upholding "the State Supreme Courts' ability to narrow state statutes so as to limit the statute's scope to unprotected conduct"); *Ferber*, 458 U.S. at 769 n.24 ("When a federal court is dealing with a federal statute challenged [under the First Amendment] as overbroad, it should, of course, construe the statute to avoid constitutional problems, if the statute is subject to such a limiting construction. . . . A state court is also free to deal with a state statute in the same way."); *see also Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 811 (7th Cir. 2014) (recognizing that the Supreme Court has engaged in "application of the constitutional-avoidance doctrine to address . . . overbreadth concerns"); *accord United States v. Miselis*, 972 F.3d 518, 531 (4th Cir. 2020) ("In [construing an allegedly overbroad statute], we must seek to avoid any constitutional problems by asking whether the statute is subject to a limiting construction." (internal quotation marks and brackets omitted)); *United States v. Brune*, 767 F.3d 1009, 1023-24 (10th Cir. 2014) (applying constitutional avoidance to an overbreadth challenge). Therefore, the First Amendment does not preclude applying the doctrine of constitutional avoidance in this case.

Reading the Policy in light of the doctrine of constitutional avoidance, we conclude that Sisney failed to show that the Policy's prohibition on sexually explicit

content is "substantially overbroad." *See Stevens*, 559 U.S. at 482. Sisney's most compelling example of allegedly sexually explicit content protected by the First Amendment is the Bible. But the Policy's definition of "sexually explicit" limits sexually explicit writings to those that include "graphic" descriptions of sexual acts. An interpretation of the word "graphic" on which the passages from the Bible that Sisney cites do not include "graphic" descriptions of sexual acts is fairly possible, even plausible. The first passage recounts how King David saw Bathsheba "washing herself" and "lay with her." *2 Samuel* 11:1-5 (KJV). In the second passage, from the *Song of Solomon*, the lover tells his beloved that her "stature is like to a palm tree, and [her] breasts to clusters of grapes" and declares that he "will take hold the boughs thereof." *Song of Solomon* 7:1-10 (KJV). Neither of these brief allusions to a sexual act, the first cloaked in euphemism and the second in metaphor, paints a "vivid picture with explicit detail," "Graphic," *The New Oxford American Dictionary* 756 (3d ed. 2010), or offers a "clear lifelike or vividly realistic description," "Graphic," *Merriam-Webster's Collegiate Dictionary* 545 (11th ed. 2005).

To be sure, even construed narrowly, the Policy's prohibition of sexually explicit content extends to some literary works that many hold in high esteem. In most cases, however, censoring these works will pass constitutional muster for the same reasons that censoring *Thrones of Desire* and *Pride and Prejudice: The Wild and Wanton Edition* did. We are unpersuaded that consistent application of the prohibition as we have construed it will limit inmates' access to literature so severely that the defendants can no longer be said to "permit a broad range of publications to be sent, received, and read." *See Thornburgh*, 490 U.S. at 418.

It is true, as Sisney points out, that the defendants have suggested that they could enforce the Policy's prohibition on sexually explicit content against the Bible if they chose to do so. But although we defer to a state agency's interpretation of its own regulation "if the meaning of the words used is in doubt," *Smith v. Sorensen*, 748 F.2d 427, 432 (8th Cir. 1984) (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413-14 (1945)), we do so only after applying canons of construction such

as the doctrine of constitutional avoidance, *see Kisor v. Wilkie*, 588 U.S. ---, 139 S. Ct. 2400, 2415 (2019) (holding that "a court must exhaust all the traditional tools of construction" before "resort[ing] to *Auer* deference" (internal quotation marks omitted)); *Union Pac. R.R.*, 738 F.3d at 893 ("Constitutional avoidance trumps even *Chevron* deference, and easily outweighs any lesser form of deference we might ordinarily afford an administrative agency . . . ."). Here, applying the doctrine of constitutional avoidance resolves Sisney's claim that the Policy's prohibition on sexually explicit content is overbroad. Consequently, we "ha[ve] no business deferring to any other reading, no matter how much the agency insists it would make more sense." *Kisor*, 139 S. Ct. at 2415.

We conclude that although resolution of Sisney's as-applied challenges does not moot his claim that the Policy's prohibition on sexually explicit content is overbroad, this claim fails on the merits.

## V.

Finally, we address Sisney's motions for sanctions. The Eleventh Amendment does not bar a federal court from enforcing its orders against a state entity, including, if necessary, by sanctions. *Hutto v. Finney*, 437 U.S. 678, 689-93 (1978). But "civil contempt should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *Taggart v. Lorenzen*, 587 U.S. ---, 139 S. Ct. 1795, 1801 (2019) (internal quotation marks, alterations, and emphasis omitted); *see also King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995) (requiring the movant to establish, among other things, that the alleged "contemnor has not diligently attempted to comply in a reasonable manner").

"There are two kinds of civil contempt penalties a court can impose." *Klett v. Pim*, 965 F.2d 587, 590 (8th Cir. 1992). "The first is a coercive penalty . . . designed to force the offending party to comply with the court's order." *Id.* The second is compensation to the movant for damages incurred "as a result of the offending party's contempt." *Id.* "A court cannot impose a coercive civil contempt sanction

if the underlying [order] is no longer in effect." *Id.* In contrast, a contempt sanction compensating the movant for damages incurred as a result of the offending party's noncompliance while the order was in effect remains appropriate even after the order is no longer in effect, unless the order was "vacated because it was issued erroneously." *Id.* Under no circumstances may a federal court impose any kind of sanction for contempt of another court's order. *Id.* at 590-91 (citing 18 U.S.C. § 401).

Here, Sisney seeks both coercive and compensatory sanctions for the defendants' alleged refusal to comply with our order denying their motion for a stay of the district court's injunction pending this appeal.[6] Now that we have resolved the appeal, this order is moot and thus no longer in effect. *See In re Champion*, 895 F.2d 490, 492 (8th Cir. 1990) (per curiam) (dismissing a motion for a stay pending appeal as moot after resolving the appeal); *Klett*, 965 F.2d at 590 (treating an order as no longer in effect for purposes of sanctions once it has become moot). Therefore, we must deny Sisney's request for coercive sanctions. Of course, Sisney remains free to ask the district court to impose coercive sanctions on the defendants if he believes that they are refusing to comply with those parts of the district court's injunction that we have affirmed. Because we are not "the court that issued [the] injunction," however, we would be unable to grant any such request. *See Klett*, 965 F.2d at 591.

As for Sisney's request for compensatory sanctions, we conclude that Sisney failed to show that the defendants "ha[ve] not diligently attempted to comply in a reasonable manner." *See King*, 65 F.3d at 1058. Sisney presents evidence that, five days after we denied the motion to stay, a prison official refused to release material that an inmate argued was protected under the district court's order on the ground that the Policy "will continue to be followed as written" while the motion was pending. But Sisney presents no evidence that this official knew that we had just

---

[6]Sisney also seeks sanctions for the defendants' alleged failure to comply with the district court's discovery orders. We cannot grant this request because we are not the court that issued the orders. *See id.*

-22-

denied the motion. On the contrary, the text of the official's response suggests that he believed that the motion was still pending. And the defendants have submitted evidence that, upon receiving notice of our denial of their motion to stay, they promptly initiated a process for bringing their procedures into compliance with the district court's order, including implementing the district court's suggestion to create viewing rooms for the consumption of sensitive material. In the meantime, the defendants were "keeping material for delivery once viewing rooms are established and opened." While the defendants may not have achieved full compliance as swiftly as they might have, and certainly not as swiftly as Sisney would have liked, we cannot say that there is no "fair ground of doubt as to the wrongfulness of [their] conduct" with respect to our denial of their motion to stay. *See Taggart*, 139 S. Ct. at 1801 (emphasis omitted). Therefore, Sisney is not entitled to compensatory sanctions for the defendants' alleged violations of our order denying their motion for a stay.

Of course, whether Sisney is entitled to compensatory sanctions for the defendants' alleged violations of those parts of the district court's injunction that we have affirmed is another question, one that he is free to raise with the district court. Again, however, because we did not issue the injunction, we cannot impose sanctions for violations of it. *See Klett*, 965 F.2d at 591.

## VI.

In sum, for the reasons explained above, we resolve this appeal as follows. We reverse the district court's grant of summary judgment for Sisney and remand for entry of summary judgment for the defendants on Sisney's challenge to the Policy as applied to *Thrones of Desire* and *Pride and Prejudice: The Wild and Wanton Edition*. We affirm the district court's grant of summary judgment for Sisney on his challenge to the Policy as applied to *Matisse, Picasso and Modern Art in Paris* and the nine pictures of Renaissance artwork. We vacate the district court's grant of summary judgment for Sisney on his claim that the Policy's prohibition on nudity is overbroad, vacate the remedy issued in connection with this summary-

judgment ruling, and remand with instructions to dismiss this claim for lack of subject-matter jurisdiction. We reverse the district court's grant of summary judgment for Sisney on his claim that the Policy's prohibition on sexually explicit content is overbroad, vacate the remedy issued in connection with this summary-judgment ruling, and remand for entry of summary judgment for the defendants on this claim. We dismiss as moot Sisney's request for coercive sanctions for the defendants' alleged violations of our denial of their motion to stay. We deny Sisney's request for compensatory sanctions for the defendants' alleged violations of our denial of their motion to stay. And we deny Sisney's request for sanctions for the defendants' alleged violations of the district court's orders.

STRAS, Circuit Judge, concurring in part and dissenting in part.

The word "moot" should not appear in this opinion. The parties do not raise it, the district court did not discuss it, and there is no reason for us to delve into the issue either. Nothing about this case is moot.

Consider the procedural history. Sisney sued several prison officials who used a 2014 prison policy to prevent him from accessing four *Pretty Face* comics; two erotic novels named *Thrones of Desire* and *Pride and Prejudice: The Wild and Wanton Edition*; an art book called *Matisse, Picasso, and Modern Art in Paris*; reproductions of Michelangelo's and Lorenzo Ghiberti's works; and a Coppertone advertisement. The policy prohibited "pornograph[y]," including "material[s]" that feature "nudity or sexually explicit" content.

Sisney raised two types of First Amendment challenges. The first was as applied, meaning he was challenging the policy's application to him. *See Republican Party of Minn. v. Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004) (defining an "as-applied challenge" as one "to the statute's application only as-applied to the party before the court"). The second was "facial overbreadth," which required him to show that "the impermissible applications of the [policy]," including to other inmates, were "substantial when judged in relation to the [its] plainly legitimate

-24-

sweep." *Id.* at 791 (explaining that the reason for allowing this type of claim is "to eliminate the deterrent or chilling effect an overbroad law may have"). Sisney personally had to have Article III standing to raise either type of challenge, but overbreadth challenges are unique in the sense that they loosen third-party standing requirements by allowing plaintiffs to raise the "First Amendment rights of others." *Id.* at 792.

In addressing the as-applied challenges, the district court gave Sisney access to some materials but not others. He could have the Michelangelo and Ghiberti reproductions, the erotic novels, and the art book, but the Coppertone advertisement and *Pretty Face* comics remained off-limits. Moving onto overbreadth, the court did not give Sisney access to anything else, but it rewrote the policy after concluding that it was substantially overbroad. By removing the words "nudity or" from the list of "pornographic material[s]," the rewritten policy is now narrower than before. Aggrieved by the now-watered-down policy, prison officials appeal the overbreadth ruling.

None of this procedural history is disputed, and it is in fact quite ordinary, other than the district court's decision to rewrite the policy. Still, the court concludes today, without input from the parties, that Sisney's failure to appeal the remedy presents a mootness problem. And best I can tell, the reason is that the district court's remedy—removing the words "nudity or" from the policy—mooted Sisney's overbreadth claim. What gets lost, however, is that the overbreadth claim has never been moot and *prison officials*, rather than Sisney, filed the appeal.

To the extent the court suggests that Sisney's overbreadth claim was moot because the revisions to the policy did not restore his access to the *Pretty Face* comics or the Coppertone advertisement, this analysis puts the cart before the horse. Overbreadth is a merits question, *see Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482–83 (1989), severability is a remedies question, *see Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2207 (2020), and a court can only

consider either after determining it has subject-matter jurisdiction. Simply put: the remedy cannot moot the underlying claim.

The proof is in the pudding. There can be no dispute that Sisney still had an injury when the district court moved onto the overbreadth challenge: his lack of access to the *Pretty Face* comics and the Coppertone advertisement. If the district court had enjoined prison officials from enforcing the whole policy, rather than taking the highly unusual step of rewriting it, then Sisney's access to those two items would have been restored. *See, e.g.*, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011); *Willson v. City of Bel-Nor, Mo.*, 924 F.3d 995, 999 (8th Cir. 2019). Regardless of what the court actually did, the fact that it *could have* fashioned "some form of meaningful relief" by enjoining enforcement of the entire policy was enough to keep the controversy alive. *See Church of Scientology of Ca. v. United States*, 506 U.S. 9, 12–13 (1992).

To the extent the court is concerned that there is *currently* no case or controversy, there is no reason to be. The aggrieved parties now are the *prison officials*, so the question for us is whether we can give *them* "any effective relief" if we decide "the [appeal] in [their] favor."[7] *Garcia v. Lawn*, 805 F.2d 1400, 1402 (9th

---

[7]The court's claim that *Sisney* must still be aggrieved for the *defendants* to appeal cannot be correct. *See ante*, at 16 n.5. Otherwise, any time a plaintiff prevails, the defendant could not appeal. Indeed, under the court's reasoning, even if the district court had enjoined the entire policy, the defendants would be stuck because "the *plaintiff's* injury" would no longer be "redressable by a favorable resolution of *his* claim," which the court thinks must "subsist[] through all stages of federal judicial proceedings, trial and appellate." *Ante*, at 16 n.5 (emphasis added) (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)). To be sure, as in *Spencer*, if the *plaintiff* is appealing, then there must be a continuing injury that is redressable by appellate review. *See Spencer*, 523 U.S. at 7 (stating that the "case-or-controversy requirement subsists through all stages of federal judicial proceedings," not that the plaintiff's injury must continue on appeal (citation omitted)). But not when the party appealing is somebody else. *See Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (explaining that Article III's requirements "must be met by persons seeking appellate review" (citation omitted)). The reason, of course, is that an adverse judgment is

-26-

Cir. 1986) ("The test for mootness of an appeal is whether the appellate court can give the *appellant* any effective relief in the event that it decides the matter on the merits in his favor. If it can grant such relief, the matter is not moot." (emphasis added)); *see also Flynn v. Sandahl*, 58 F.3d 283, 287 (7th Cir. 1995).

Viewed through this lens, I have no doubt that we can. The prison officials have challenged the district court's overbreadth ruling because they want to ban additional items containing nudity that are now available to prisoners under the narrowed policy. If we agree with them that Sisney failed to meet his burden of proving that the prison's original policy was substantially overbroad, then not only will they be able to potentially withhold additional items from Sisney, but from other prisoners too. *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982); *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38 (1976).

I would reach exactly that conclusion. Sisney had the "burden of demonstrating, from the text of the [policy] and from actual fact, that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (internal quotation marks and brackets omitted)). To satisfy this burden, he had to show that "a substantial number of [the policy's] applications are unconstitutional, [when] judged in relation to [its] plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (internal quotation marks omitted).

Sisney never made this showing. First, he did not "adduce any evidence that third parties will be affected in any manner differently from [him]self." *Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks*, 864 F.3d 905, 912 (8th Cir. 2017) (concluding that "[i]t is inappropriate to entertain a facial overbreadth challenge" under these circumstances). Second, even if he proved that the prison's policy prevents access to some materials that the First Amendment protects, the record does not establish how prevalent those materials are, much less how they compare to the

---

itself a "kind of injury" that supports appellate standing. *ASARCO Inc. v. Kadish*, 490 U.S. 605, 618 (1989) (citing *Nashville, C. & St. L. R. Co. v. Wallace*, 288 U.S. 249, 261–65 (1933)).

quantity of materials that the prison can constitutionally withhold. *See Wash. State Grange*, 552 U.S. at 449 n.6 ("We generally do not apply the 'strong medicine' of overbreadth analysis where the parties fail to describe the instances of arguable overbreadth of the contested law."). In short, there may well be substantial overbreadth, but Sisney failed to prove it.

Without proof of substantial overbreadth, there was nothing for the district court to remedy. Accordingly, rather than dismissing in part for mootness, as the court does, I would vacate and remand for further proceedings.

_____