# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 21-1784

———————————————

Sleep Number Corporation

*Plaintiff - Appellee*

v.

Steven Jay Young; Carl Hewitt; UDP Labs, Inc., a Delaware corporation

*Defendants - Appellants*

——————————

Appeal from United States District Court
for the District of Minnesota

——————————

Submitted: December 15, 2021
Filed: May 11, 2022

——————————

Before SMITH, Chief Judge, GRUENDER and KOBES, Circuit Judges.

——————————

GRUENDER, Circuit Judge.

Sleep Number Corporation sued Steven Young, Carl Hewitt, and UDP Labs, Inc., asserting ownership of the inventions claimed in certain patent applications filed by UDP with the United States Patent and Trademark Office ("USPTO"). The district court granted Sleep Number's motion for a preliminary injunction preventing

the defendants from further prosecuting or amending the patent applications.[1]  The defendants appeal, and we affirm.

## I.

Steven Young founded BAM Labs, a California-based company, in 2006. Carl Hewitt joined BAM Labs a few years later.  Together, Young and Hewitt developed technology that monitors infants' biometrics while they sleep.  Sleep Number, a Minnesota-based corporation specializing in the manufacture and sale of adjustable air beds, partnered with BAM Labs in 2012.  Through their partnership, Young and Hewitt's inventions were adapted to create SleepIQ technology for Sleep Number smart beds.  This technology measures biometric data such as breathing patterns, movements, and blood flow through the use of sensors.  The smart-bed user may view this data through Sleep Number's mobile app.  In 2015, Sleep Number acquired BAM Labs as a business unit, renaming it SleepIQ LABS.  Young and Hewitt continued to develop sleep technology for SleepIQ LABS, serving as the Chief Technology Officer and Vice President of Engineering, respectively.

After two years as employees, Young and Hewitt informed Sleep Number that they wished to pursue their own medical-technology venture.  Sleep Number asked that Hewitt and Young remain involved as consultants to ensure a smooth transition. Accordingly, Young and Hewitt entered into consulting agreements with Sleep Number in December of 2017.  The consulting agreements required Young and Hewitt to disclose and assign to Sleep Number the rights to inventions within a defined Product Development Scope ("PDS") that were developed or ideated during the period of the consulting agreements.  The PDS covered "any ideas, conceptions, inventions, or plans relating to sleep, mattresses, bedding, sleep monitoring, health or wellness as it relates to sleep (including biometric monitoring relating to sleep), or bedroom or sleep technologies."  The PDS expressly excluded "monitoring

---

[1]The Honorable Nancy T. Brasel, United States District Judge for the District of Minnesota.

technologies for sudden infant death syndrome" ("SIDS") and "blood pressure monitoring technologies."

In January 2018, shortly after entering into the consulting agreements, Young and Hewitt incorporated their new venture, UDP. In October, Young and Hewitt filed a provisional patent application (the "'613 application") with the USPTO on behalf of UDP. The '613 application was for an invention that uses load-bearing sensors placed under a substrate—such as a bed, couch, or examination table—to measure biometric data including respiration, heart rate, and weight. This biometric data may be gathered while the user is asleep or awake. According to the '613 application, the invention is for use in a medical setting.

After filing the '613 application, Young and Hewitt met with executive officers of Sleep Number and informed them that they wished to terminate their consulting agreements. Additionally, Young and Hewitt sought an addendum to the consulting agreements declaring that their work at UDP did not fall within the PDS. Sleep Number declined, believing that Young and Hewitt's work on behalf of UDP fell within the PDS. Young and Hewitt formally terminated their consulting agreements in November 2018.

In February 2019, UDP filed a second provisional patent application (the "'623 application"), which included some of the diagrams and disclosures from the '613 application. The next year, UDP filed four additional patent applications ("'087," "'367," "'385," and "'848") claiming priority—directly or through a continuation-in-part—to both the '613 and the '623 applications. *See* 35 U.S.C. § 120; *Antares Pharma, Inc. v. Medac Pharma Inc.*, 771 F.3d 1354, 1358 (Fed. Cir. 2014) (explaining that 35 U.S.C. § 120 allows a patent application for an invention to claim the priority date of an earlier patent application that disclosed the invention).

Sleep Number filed this suit on July 2, 2020, asserting that the inventions claimed under UDP's patent applications are owned by Sleep Number and that, consequently, Sleep Number should control the patent applications for the

inventions. Four months into the litigation, UDP filed several requests with the USPTO for corrected filing receipts, removing the four most recent applications' claims of priority to the '613 application. Because of these changes, the four most recent applications now claim priority to only the '623 application filed after the termination of the consulting agreements.

Sleep Number sought a preliminary injunction preventing the defendants from further prosecuting or amending any patent claims with the USPTO. The district court granted its request. The defendants appeal.

## II.

We review the district court's decision to grant a preliminary injunction "for abuse of discretion, with factual findings examined for clear error and legal conclusions considered *de novo*." *Brakebill v. Jaeger*, 932 F.3d 671, 676 (8th Cir. 2019). Because the district court has "considerable discretion" in "determining whether or not a preliminary injunction should issue," the scope of this court's review is "very limited." *Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 866 (8th Cir. 1977).

"A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citations omitted). In deciding whether to issue a preliminary injunction, the district court considers four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). Although "[n]o single factor is dispositive," and "the district court must balance all factors to determine whether the injunction should issue," *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021), the third factor—probability of

success—is the most significant. *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013).

A.

We first assess whether Sleep Number has a likelihood of success on the merits. The parties debate whether Sleep Number must demonstrate that it has a "fair chance" of prevailing on the merits or that it is "more likely than not" to prevail. We agree with Sleep Number that the fair-chance standard is correct. The fair-chance standard is "typically required," while the more-likely-than-not standard is reserved for injunctions against the enforcement of statutes and regulations, which are "entitled to a higher degree of deference and should not be enjoined lightly." *Rodgers v. Bryant*, 942 F.3d 451, 455-56 (8th Cir. 2019) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)); *see also D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999-1000 (8th Cir. 2019). To show a "fair chance of prevailing," a party must show that its claims provide "fair ground for litigation," *Watkins*, 346 F.3d at 844, but it need not show that it has a "greater than fifty per cent likelihood" of success, *Bao Xiong*, 917 F.3d at 999.

To prevail on the merits, Sleep Number must show that the inventions described in the patent applications fall within the PDS as defined in the consulting agreements. The parties agree that Delaware law governs the interpretation of the consulting agreements pursuant to a choice-of-law provision. Delaware follows "'traditional principles of contract interpretation,' including the principle that courts must give 'effect to the plain meaning of a contract's terms and provisions when the contract is clear and unambiguous.'" *Gateway Customer Sols., LLC v. GC Servs. Ltd. P'ship*, 825 F.3d 502, 505 (8th Cir. 2016) (quoting *ConAgra Foods, Inc. v. Lexington Ins.*, 21 A.3d 62, 68-69 (Del. 2011)).

Here, the plain meaning of the language in the consulting agreements clearly and unambiguously places the inventions described in the patent applications within

the PDS. The PDS includes "any ideas, conceptions, inventions, or plans relating to sleep, mattresses, bedding, sleep monitoring, health or wellness as it relates to sleep (including biometric monitoring relating to sleep), or bedroom or sleep technologies," except for "monitoring technologies for [SIDS]" and "blood pressure monitoring technologies." The district court focused on the depictions of and references to beds in the applications, but the inventions have an even more direct relation to the items listed in the consulting agreements. *See Duffner v. City of St. Peters*, 930 F.3d 973, 976 (8th Cir. 2019) ("We may affirm on any ground supported by the record."). The '613 and '623 applications pertain to inventions that monitor biometric data while a person is lying down, including data relevant to sleep apnea. And the '087, '367, '385, and '848 applications describe devices and methods for collecting this data by means of sensors affixed to bed legs or bed frames. Thus, all six inventions plainly relate to sleep-related biometric monitoring, bedroom technologies, or both. *Cf. Fla. Chem. Co. v. Flotek Indus., Inc.*, 262 A.3d 1066, 1083 n.2 (Del. Ch. 2021) (indicating that the term "relating to" is to be interpreted broadly). And although, as the defendants argue, the consulting agreements do not explicitly list "beds" as falling within the PDS, they do list "biometric monitoring relating to sleep" and "bedroom or sleep technologies."

Nor do the inventions fall within the exceptions for SIDS or blood-pressure monitoring. There is no evidence beyond the defendants' bare assertions that the inventions are designed to detect SIDS or monitor blood pressure. The defendants were required to provide a written description of the inventions in "full, clear, concise, and exact terms," *see* 35 U.S.C. § 112(a), but did not indicate in any way— whether by using the words "SIDS" or "monitoring blood pressure" or otherwise— that their inventions were directed at detecting SIDS or monitoring blood pressure. Therefore, the district court did not clearly err in finding that the inventions likely do not fall within the exceptions to the PDS. *Cf. MHL TEK, LLC v. Nissan Motor Co.*, 655 F.3d 1266, 1278 (Fed. Cir. 2011) (rejecting the argument that inventions are "subject to the 'carve out' provision of the Patent Assignment" because it would be "contrary to the language of the assignment").

The defendants argue that the '623, '367, '087, '848, and '385 applications nonetheless fall outside the PDS because they describe inventions created after the consulting agreements were terminated. The defendants concede, however, that the '613 application was filed before the termination of the consulting agreements. And when this lawsuit was filed, the '367, '087, '848, and '385 applications all claimed priority to the '613 application. As the district court noted, this "mean[s] that UDP, at least initially, believed that the later applications were based on the same technology as the '613 application." The technology in the '623 application is based on the same technology as the '613 application. The inventions in each application perform the same functions, and the applications contain descriptive summaries that are almost verbatim. That the technology in the '623 application is an improvement to the technology in the '613 application does not overcome the fact that the invention in the '623 application itself seems to have been ideated at the same time as the invention for the '613 application. The PDS covers products developed or ideated during the term of the consulting agreements. Just because the defendants filed certain patent applications after the termination of the consulting agreements does not mean that that they did not conceive of the inventions while Young and Hewitt were consulting with Sleep Number. The defendants claim that giving up priority to the '613 application was simply honoring their duty of candor to the USPTO rather than a strategic litigation move. But, as noted by the district court, their claim "is belied by the fact that [the defendants] would have known [of their error] when [they were] filing the later applications, and gave no explanation for waiting, in some cases, nearly two years to seek to amend them." Therefore, the court's factual finding that the likely conception dates of the inventions occurred prior to the termination of the consulting agreements is not clearly erroneous, and there is at least a fair chance that Sleep Number will succeed on the merits of its claim. *Cf. Bio-Rad Labs., Inc. v. Int'l Trade Comm'n*, 996 F.3d 1302, 1319 (Fed. Cir. 2021) (rejecting former employees' claim of patent coownership because, unlike in this case, the inventors' ideas were not yet concrete enough when they were employed).

We next turn to the district court's conclusion that there is a threat of irreparable harm that justifies a preliminary injunction. "We review this determination for clear error." *United Healthcare Ins. v. AdvancePCS*, 316 F.3d 737, 740 (8th Cir. 2002). The district court has "considerable discretion" in "determining whether or not a preliminary injunction should issue," and our scope of review is "very limited." *Planned Parenthood of Minn.*, 558 F.2d at 866. Sleep Number is not required to prove with certainty the threat of irreparable harm, but it must prove that "irreparable injury is likely in the absence of an injunction." *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "Irreparable harm occurs when a party has no adequate remedy at law." *General Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).

The district court relied on the fact that the defendants could injure Sleep Number during the patent-prosecution process. It suggested that when the USPTO inevitably issues its written commentary in response to each patent application (an "Office Action"), the defendants could respond by "amend[ing], narrow[ing], or otherwise alter[ing] the scope of the patents." As evidence that the defendants might respond to a future Office Action in a way that prejudices Sleep Number's purported patent rights, the district court gave weight to the defendants' amendment of the '087, '367, '385, and '848 applications to eliminate their claims of priority to the '613 application. Given this action, the district court concluded that the parties' incentives when responding to the Office Action would not be aligned and that the defendants would be "incentivized to prosecute the patents in a way that bolsters their claim to ownership of the patents and weakens Sleep Number's," such as by "amend[ing] an application in a way that would cause the application to no longer fall within the Product Development Scope."

The district court did not clearly err in concluding that Sleep Number has demonstrated a threat of irreparable harm. As the district court said, "absent an injunction, UDP would be permitted to respond to an Office Action." It is true that

the final Office Actions have not issued yet, and "speculative harm does not support a preliminary injunction." *See MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) (brackets omitted). But we cannot say that the district court clearly erred in finding that, absent an injunction, an Office Action was likely to occur during the pendency of this litigation.[2] Nor can we say, in light of the defendants' curiously timed amendment of the later applications to eliminate their claims of priority to the '613 application, that the district court clearly erred in finding that the defendants would likely take that opportunity to influence the patent-prosecution process in a manner adverse to Sleep Number. *Cf. Moore v. Frigidaire Corp.*, 71 F.2d 840, 846 (8th Cir. 1934) (recognizing that the scope of patentable creations can be narrowed through the patent-prosecution process). It is not clear that such harm could be repaired. The processes suggested by the defendants for repairing the harm would require Sleep Number to submit a request to the USPTO, leaving it to the USPTO's discretion whether the change could be made. *See* MPEP §§ 211.02(a) (describing that correcting or adding a benefit claim after filing can involve a request for continued examination or a reissue application); 37 C.F.R. § 1.78 (explaining that an applicant can file a continuation application to adjust claims of the patent). On the unusual facts of this case, we conclude that Sleep Number has shown that "irreparable injury is likely in the absence of an injunction." *See Winter*, 555 U.S. at 22.

---

[2]In fact, non-final Office Actions for two of the patent applications—'367 and '087—were recently issued in 2022. Public Patent Application Information Retrieval, USPTO, https://portal.uspto.gov/pair/PublicPair (last visited Apr. 14, 2022) (enter application number; then press "SEARCH"; then see "Status" and "Status Date"). *See Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 514 n.3 (Fed. Cir. 1990) (taking judicial notice of an Office Action); *Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 145 (N.D. Cal. 2020) ("Materials in the online files of the USPTO . . . are proper subjects of judicial notice.").

C.

The remaining two factors—balance of the harms and the public interest—both weigh in Sleep Number's favor as well. *See Dataphase*, 640 F.2d at 113. First, absent an injunction, Sleep Number faces a threat of harm if it cannot participate in the patent-prosecution process for the patent applications. In contrast, the harm to defendants is a mere delay in participation in the patent-prosecution process. Second, the issuance of a preliminary injunction benefits the public interest. Because the public has an interest in enforcing contractual obligations and Sleep Number has shown a likelihood of success on the merits, issuing a preliminary injunction to put the patent-prosecution process on hold during litigation benefits the public interest. *See Medicine Shoppe Int'l., Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) ("[W]e agree that the public interest would not be served by permitting a party to avoid contractual obligations.").[3]

**III.**

For the foregoing reasons, we affirm the district court's grant of Sleep Number's motion for a preliminary injunction.[4]

_____

_____

[3]The defendants argue for the first time on appeal that the injunction is overbroad because it invades the third-party property rights of the nonparty inventors named in the patent applications. "In general," in the civil context, "we will not consider arguments raised for the first time on appeal unless failure to do so would result in a miscarriage of justice." *Oglesby v. Lesan*, 929 F.3d 526, 534 (8th Cir. 2019) (internal quotation marks omitted). Here, "we find no miscarriage of justice warranting further analysis." *Id.*

[4]We deny Sleep Number's motion to expand the record as moot.