# United States Court of Appeals

## For the Eighth Circuit

_____

No. 24-2707

_____

Anthony Schmitt

*Plaintiff - Appellant*

v.

Jolene Rebertus, in her official capacity as Assistant Commissioner of the Minnesota Department of Corrections; Paul Schnell, in his official capacity as Commissioner of the Minnesota Department of Corrections

*Defendants - Appellees*

------------------------------

Christian Legal Society; Good News Global; Islam and Religious Freedom Action Team; Jewish Coalition for Religious Liberty; The National Association of Evangelicals; The National Legal Foundation

*Amici on Behalf of Appellant(s)*

Freedom From Religion Foundation

*Amicus on Behalf of Appellee(s)*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: February 11, 2025
Filed: August 14, 2025
_____

Before SMITH, KELLY, and KOBES, Circuit Judges.

_____

SMITH, Circuit Judge.

Anthony Schmitt appeals from the district court's denial of his motion for a preliminary injunction to require the Minnesota Department of Corrections (MDOC)[1] to reinstate "The Quest for Authentic Manhood" (Quest) program that he volunteered to teach at the Minnesota Correctional Facility (MCF). The MDOC terminated Quest after determining that the program "directly conflicts with the diversity, equity, and inclusivity values of the [MDOC] by defining manhood, or the study of masculinity, through a biblical lense of what a 'real man looks like[.']" R. Doc. 16-2, at 4. For the reasons discussed *infra*, we reverse the district court's denial of Schmitt's motion for a preliminary injunction and remand to the district court for entry of an order reinstating the Quest program at MCF pending a full adjudication of the case on the merits.

## I. *Background*

In 2012, Schmitt, a Christian, volunteered to teach Quest at MCF. "Quest was created and narrated by Dr. Robert Lewis, through the organization 'Authentic Manhood.'" R. Doc. 1, at ¶ 38; *see also* R. Doc. 16, at ¶ 16. Quest defines its purpose as follows:

> Authentic Manhood is all about setting men up to live lives of truth, passion and purpose. Our resources offer clear and practical Biblical insights on God's design for manhood that are both refreshing and inspiring. We point men to a gospel-centered vision of life that sets them up to enjoy God's grace as they pursue the promises of His Word.

[1]Schmitt sued Jolene Rebertus, in her official capacity as Assistant Commissioner of the MDOC; and Paul Schnell, in his official capacity as Commissioner of the MDOC.

R. Doc. 1, at ¶ 38. Quest is composed of 24 videos; each video is about one hour in length and consists of a 45-minute session and discussion. These videos "delve[] into very difficult issues with relationships that many men have encountered," including "relationships with fathers, mothers, wives, and girlfriends." R. Doc. 16, at ¶ 17. Quest has been shown in "churches and in prisons across the United States." *Id.* at ¶ 19. Since its implementation at MCF, Quest has been a voluntary program. Over the years, more than a thousand inmates have chosen to enroll in Quest at MCF.

From 2012 until the onset of COVID-19 in 2020, Schmitt and his colleague "taught Quest at MCF in two sessions each week." *Id.* at ¶ 22. "MCF advertised Quest in each of the housing units of the prison . . . ." *Id.* at ¶ 26. Inmates voluntarily signed up for the program by contacting the MCF chaplain. Inmates understood that they were committing to 12 weeks of programming. Because inmates are frequently transferred from MCF, Schmitt saved time by presenting only 17 of the 24 Quest videos to ensure that as many inmates as possible could graduate. At the program's conclusion, approximately 25 to 35 inmates graduated.

In 2018, Charles Sutter, MDOC Statewide Recidivism Reduction Project Supervisor, reviewed the Quest program. Sutter identified several areas of Quest that aligned with evidence-based practice and some areas that did not. Sutter then included the following "Note":

> Discrimination based on sexual orientation is illegal in Minnesota. Under the Minnesota Human Rights Act, sexual orientation is a "protected class."
>
> And it is illegal to treat anyone differently because of sexual orientation in:
>
> • Employment
> • Housing
> • Public accommodations

- Public services
- Education
- Credit
- Business

These are called "protected areas." The Quest module I observed was called "Week 16-Remembering Dad[."] It discussed, among other things, the injuries caused by growing up in a household with an absent father. Of those injuries, sexual orientation was mentioned and described homosexuality as an injury. This view is not supported by research [and] is offensive and close to running afoul of Minnesota's Human Rights Act. It should be noted that, some jurisdictions are now stating that treatment that addresses homosexuality as a treatable character defect are psychologically damaging and illegal. You should remove this from Quest's programming.

R. Doc. 16-1, at 4.

The discussion of sexual orientation in "Remembering Dad" is "consistent with [Schmitt's] religious belief that homosexual acts are sinful, not solely driven by innate sexual orientation, and cause separation between people and God, as all sin does, but can be avoided through repentance." R. Doc. 16, at ¶ 40. Nonetheless, after reviewing Sutter's findings, Schmitt began skipping that portion of the video in his presentation of Quest.

On March 17, 2020, MCF ceased all religious programming, including Quest, because of COVID-19. Religious programing at MCF resumed in 2023. Once programming resumed, Schmitt selected the 11 videos that he believed would most "help the inmates get through the most essential materials in the Quest program." *Id.* at ¶ 46.

Then, on July 10, 2023, Jolene Rebertus, MDOC Assistant Commissioner of Health, Recovery, & Programming, sent Schmitt the following email informing him that he would no longer be permitted to teach Quest:

After review of The Quest for Authentic Manhood curriculum, the decision has been made to discontinue offering this program at MCF- St. Cloud to incarcerated individuals.

*The program directly conflicts with the diversity, equity, and inclusivity values of the department by defining manhood, or the study of masculinity, through a biblical lens of what a "real man looks like*[*."*] Throughout all sessions reviewed, men were only identified as heterosexual, seeking ideal relationships and marriage with women. It is evident that throughout this curriculum, manhood can only be achieved through heterosexual relationships.

Additionally, throughout many of the sessions, women are also identified as the problem for creating "soft males[,"] described as indecisive and weak. Women are described as having fragile frames and not physically as strong. Mothers are described as ignorant, suffocating, needy, and unwilling to release control of their sons.

The ideal marriage core role for the wife is described as the "helper" and husband as the "head[."] Women are described as submissive in this role, keeping his leadership in her view, not competing with him, and to wait for him to take charge. While the teachings do describe the woman in this role as "honorable[,"] the reinforced stereotypes and biases can be hurtful and downright dangerous for those participants who either committed acts of violence, domestic violence, or may be victims of violence by women.

Our population should be able to explore their identity with professionals who root practice and teachings safely in trauma informed science and research. The complete disregard for identifying anyone as a "successful man" who doesn't fit the picture outlined in these sessions completely defies our mission of a person-centered approach to transforming lives.

Religious services are provided in our prisons as an ongoing opportunity to explore and practice teachings and traditions of an individual's choosing. However, just because a program identifies as a religious program does not mean the DOC must provide it. *Quest teaches*

*participants about manhood through a lens of discrimination, exclusivity, gender biases and stereotypes* that not only contradict the DOC's mission of providing transformational programming, but can be hurtful to participants, their families, and victims.

R. Doc. 16-2, at 4 (emphases added).

Schmitt asked Rebertus to reconsider, but she reaffirmed the MDOC's decision to discontinue Quest. She advised that the MDOC "take[s] [its] obligations to provide incarcerated individuals with opportunities to pursue their individual spiritual beliefs and practices very seriously. Providing spiritual care related to the sacred and/or religious needs of the individuals entrusted in [the MDOC's] custody is fundamental." R. Doc. 16-3, at 4 (emphasis omitted).

Schmitt filed suit, alleging that the MDOC's decision to terminate Quest at MCF violated his First Amendment rights to free speech and free exercise of religion and establishes a denominational preference in violation of the Establishment Clause. Schmitt moved for a preliminary injunction to reinstate Quest.

After applying the *Dataphase*[2] factors, the district court denied Schmitt's motion for a preliminary injunction. In analyzing Schmitt's likelihood of success on the merits, the district court applied the standard of review set forth in *Turner v. Safley*, 482 U.S. 78 (1987). "*Turner* instructs courts to uphold prison regulations that burden constitutional rights so long as they are 'reasonably related to legitimate penological interests.'" *Schmitt v. Rebertus*, No. 0:24-cv-00034-JRT-LIB, 2024 WL 3904665, at *2 (D. Minn. Aug. 22, 2024) (quoting *Turner*, 482 U.S. at 89). Applying

---

[2]*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc) (holding that courts apply a four-factor test in evaluating a motion for a preliminary injunction: (1) likelihood of success on the merits, (2) threat of irreparable harm, (3) balance between the harm and the harm that injunctive relief would cause to the other party, and (4) the public interest).

the first *Turner* factor, the district court concluded that "there is a rational connection between Rebertus's decision to terminate Quest and [the MDOC's] legitimate penological interest[]" in "rehabilitat[ing] incarcerated individuals and reduc[ing] recidivism." *Id.* at \*3. Schmitt argued that "as a matter of law, there is no legitimate interest in discriminating on the basis of religion." *Id.* at \*4. The district court, however, determined that "Rebertus's termination decision was neutral in the technical sense." *Id.* (internal quotation marks omitted).

According to the court, Rebertus "did not terminate Quest because of its religious nature" but instead "because it teaches 'discrimination, exclusivity, gender biases, and stereotypes' that directly conflict with the prison's rehabilitative mission." *Id.* (quoting R. Doc. 16-2, at 4). The court characterized "Rebertus's reference to Schmitt's 'biblical lens' [as] descriptive, not discriminatory." *Id.* (quoting R. Doc. 16-2, at 4). The second *Turner* factor, the district court explained, also weighed in favor of the MDOC because "there are alternative means for Schmitt to exercise his allegedly infringed rights." *Id.* Specifically, Schmitt could "volunteer again so long as he adopts a curriculum that comports with the facility's programming requirements" or "continue to instruct inmates in the Quest curriculum through individual visits and written correspondence." *Id.* Under the third *Turner* factor, the district court concluded that accommodating Schmitt's preference would burden MCF because "Schmitt's teachings may harm those inmates who committed or were victims of acts of gender-based violence." *Id.* Finally, the court found that the fourth *Turner* factor weighed against Schmitt because Schmitt failed to "propose[] a *de minimis* cost alternative." *Id.*

As to the remaining *Dataphase* factors, the district court concluded that (1) because Schmitt's First Amendment rights were not violated, he "fail[ed] to show irreparable harm"; (2) the public had a strong interest "in allowing prison administrators discretion over inmate rehabilitation and the operation of their facilities"; and (3) "the balance of harms and public interest favor[ed] Rebertus"

based on her determination "that the Quest program is inappropriate for the prison environment and detrimental to the rehabilitative mission." *Id.* at \*4–5.

## II. *Discussion*

On appeal, Schmitt challenges the district court's denial of his motion for a preliminary injunction. Schmitt argues that the MDOC "cancelled Quest because of [his] religious beliefs, meaning that their decision is subject to the strictest scrutiny under the law." Appellant's Br. at 26. Applying strict scrutiny, Schmitt argues that he can "easily demonstrate a fair likelihood of success on the merits of the case." *Id.* (internal quotation marks omitted). He maintains that the district court erred in applying *Turner* because "[a]ctions *targeting* non-inmates based on *their* religious beliefs and speech . . . are not evaluated under *Turner*." *Id.* at 29. Alternatively, he argues that even if *Turner* applies, he is still likely to prevail on the merits.

The MDOC argues that "prisons are nonpublic fora for First Amendment purposes, so [it] has a right to make subject-matter distinctions among its program offerings and limit access to its prisons." Appellees' Br. at 13. It also argues that even "[i]f Schmitt has a constitutional right to dictate the content of [M]DOC prison programming, the district court correctly examined Schmitt's claims using the deferential test . . . in *Turner v. Safley*." *Id*. at 12. Applying this deferential test, the MDOC maintains that its "decision to discontinue Quest served legitimate penological interests." *Id.*[3]

---

[3]The MDOC also "contend[s] for the first time on appeal that [its rehabilitative programming] should be treated as government speech, and, as such exempt from . . . First Amendment scrutiny." *Byrne v. Rutledge*, 623 F.3d 46, 53 n.7 (2d Cir. 2010) (internal quotation marks omitted). As Schmitt points out, nowhere in the MDOC's briefing below did it argue that the government speech doctrine is applicable. *See generally* R. Doc. 21. Instead, it argued that "Schmitt is not likely to succeed on the merits of his First Amendment claims because the [M]DOC's decision to discontinue Quest as a programming option for incarcerated persons at MCF-SCL was reasonably related to a legitimate penological interest." *Id.* at 10. Because the MDOC failed to advance this argument before the district court, we will not consider it for the first

We possess jurisdiction to review a district court's interlocutory order denying a party's motion for a preliminary injunction. *Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 892 (8th Cir. 2024) (citing 28 U.S.C. § 1292(a)(1)). "We review a district court's ultimate ruling on a preliminary injunction for abuse of discretion, though we review its underlying legal conclusions de novo." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013). We review for clear error the district court's factual findings. *Hotchkiss*, 115 F.3d at 892.

In deciding whether to grant preliminary injunctive relief, courts consider the four *Dataphase* factors: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties' litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc.*, 640 F.2d at 114.

## A. *Likelihood of Success on the Merits*

"While no single [*Dataphase*] factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (internal quotation marks and citations omitted). Schmitt "must demonstrate that [he] has a 'fair chance' of prevailing on the merits." *Sleep Number Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022). "To show a fair chance of prevailing, [Schmitt] must show that [his] claims provide fair ground for litigation, but [he] need not show that [he] has a greater than fifty per cent likelihood of success." *Id.* at 1016–17 (internal quotation marks and citations omitted).

---

time on appeal. *See Byrne*, 623 F.3d at 53 n.7 (stating that the respondents' "position was never advanced before the district court and accordingly will not be considered" on appeal); *Perry v. Precythe*, 121 F.4th 711, 716 (8th Cir. 2024) ("[O]rdinarily, this court will not consider an argument raised for the first time on appeal." (internal quotation marks omitted)).

In *Turner*, the Supreme Court "formulate[d] a standard of review for prisoners' constitutional claims that is responsive both to the 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights.'" 482 U.S. at 85 (second alteration in original) (quoting *Procunier v. Martinez*, 416 U.S. 396, 406 (1974)). The Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. This standard ensures that "prison administrators, and not the courts, . . . make the difficult judgments concerning institutional operations." *Id.* (cleaned up). "Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Id.* Applying strict scrutiny in such circumstances "would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand." *Id.* The result would be courts "becom[ing] the primary arbiters of what constitutes the best solution to every administrative problem, thereby 'unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration.'" *Id.* (second alteration in original) (quoting *Martinez*, 416 U.S. at 407).

The reasonableness test articulated in *Turner* is composed of four factors:

(1) whether the policy has a valid rational connection to a legitimate governmental interest;

(2) whether alternative means are open to those desiring to communicate with inmates to exercise the asserted right;

(3) what impact an accommodation of the right would have on guards and inmates and prison resources; and

(4) whether there are ready alternatives to the policy.

*Hum. Rts. Def. Ctr. v. Baxter Cnty.* (*Baxter II*), 129 F.4th 498, 504 (8th Cir. 2025) (quoting *Hum. Rts. Def. Ctr. v. Baxter Cnty.* (*Baxter I*), 999 F.3d 1160, 1164 (8th Cir. 2021)). "The first factor operates as a *threshold condition* that the [policy] must satisfy to pass constitutional muster." *Sisney v. Kaemingk*, 15 F.4th 1181, 1190 (8th Cir. 2021) (emphasis added). Only if the policy "satisfies this threshold requirement [must] the court . . . determine the [policy's] constitutionality by balancing the remaining three factors." *Id.*

Subsequently, "the Supreme Court found that the *Turner* analysis applies to restrictions on the rights of inmates *and* outsiders, and 'any attempt to forge separate standards for cases implicating the rights of outsiders is out of step' with the supporting cases the Court expressly relied on in *Turner*." *Simpson v. Cnty. of Cape Girardeau*, 879 F.3d 273, 278 n.2 (8th Cir. 2018) (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 410 n.9 (1989)); *see also Baxter II*, 129 F.4th at 503 (applying *Turner* "[t]o determine whether a jail policy violates the First Amendment rights of an entity seeking to communicate with inmates").

But "*Turner*'s reasonable-relationship test [applies] *only* to rights that are inconsistent with proper incarceration." *Johnson v. California*, 543 U.S. 499, 510 (2005) (internal quotation marks omitted). In other words, it applies to "rights that must *necessarily* be limited in the prison context." *Garrett v. Lumpkin*, 96 F.4th 896, 902 (5th Cir. 2024) (citing *Johnson*, 543 U.S. at 510 ("This is because certain privileges and rights must necessarily be limited in the prison context.")). The Supreme Court has applied *Turner* to "First Amendment challenges to prison regulations, including restrictions on freedom of association, limits on inmate correspondence, restrictions on inmates' access to courts, restrictions on receipt of subscription publications, and work rules limiting prisoners' attendance at religious services." *Johnson*, 543 U.S. at 510 (citations omitted).

By contrast, *Turner* does *not* apply to rights that are "consistent with proper incarceration." *Lumumba v. Kiser*, 116 F.4th 269, 279 (4th Cir. 2024). For example,

-11-

*Turner* does not apply to "[t]he right not to be discriminated against based on one's race." *Johnson*, 543 U.S. at 510. Instead, "*all* racial classifications [imposed by the government] . . . must be analyzed by a reviewing court under strict scrutiny." *Roe v. Crawford*, 514 F.3d 789, 793 (8th Cir. 2008) (alteration and ellipsis in original) (quoting *Johnson*, 543 U.S. at 505). This is because "[r]acial classifications are viewed as immediately suspect, and their usage can seriously damage the integrity of a prison system." *Id.* at 793–94 (citation omitted). Additionally, the Supreme Court has "not used *Turner* to evaluate Eighth Amendment claims of cruel and unusual punishment in prison." *Johnson*, 543 U.S. at 511 (recognizing that the "'deliberate indifference' standard" applies to Eighth Amendment claims). "This is because the integrity of the criminal justice system depends on full compliance with the Eighth Amendment." *Id.*

Schmitt contends that strict scrutiny, not *Turner*, applies to his First Amendment claims. He argues that "just because courts have applied *Turner* to First Amendment cases . . . when the regulation is neutral and generally applicable[] does not mean they apply *Turner*" to cases like his that involve policies that discriminate against religion. Appellant's Br. at 47–48. Schmitt maintains that "*Turner* is not the correct path when anyone, inmate or outsider, is targeted for non-neutral treatment because of their religious beliefs." *Id.* at 48.

We need not, however, resolve whether strict scrutiny applies to Schmitt's particular First Amendment claims. Assuming, without deciding, that *Turner* applies, we hold that on the preliminary injunction record before us, Schmitt is likely to succeed on the merits of his First Amendment claims.

"We begin with the first [*Turner*] factor"—"whether the policy has a valid rational connection to a legitimate governmental interest." *Baxter II*, 129 F.4th at 504 (internal quotation marks omitted). "Without a rational connection to a legitimate governmental interest, a policy fails the *Turner* test irrespective of whether the other factors tilt in its favor." *Id.* (internal quotation marks omitted). "Generally, the prison

bears the burden of proving the existence of a rational connection between the challenged regulation and a legitimate government interest." *Sisney*, 15 F.4th at 1190 (internal quotation marks omitted). To satisfy this burden, the prison must show "that the policymaker might reasonably have thought that" the policy would "advance[] the government interest." *Id.* (internal quotation marks omitted). "Unless a rational connection between the regulation and the asserted interest is a matter of common sense, the prison must proffer some evidence to support the existence of such a connection." *Id.* (internal quotation marks and citations omitted).

Here, the district court found that in the MDOC's letter terminating Quest, Rebertus advanced the MDOC's penological interest in rehabilitating inmates and reducing recidivism.[4] "[R]ehabilitation is a legitimate penological interest . . . ." *McKune v. Lile*, 536 U.S. 24, 36 (2002); *see also Dawson v. Scurr*, 986 F.2d 257, 262 (8th Cir. 1993) (recognizing "the legitimate penological interest[] in rehabilitation").

The first *Turner* factor, however, requires more than a legitimate penological interest. "[T]he governmental objective must be a legitimate *and* neutral one." *Turner*, 482 U.S. at 90 (emphasis added). A prison policy must "operate[] in a neutral fashion, without regard to the content of the expression." *Id.* "This means that the proffered mechanism by which the regulation promotes the legitimate government interest must be 'unrelated to the suppression of expression.'" *Sisney*, 15 F.4th at 1190 (quoting *Thornburgh*, 490 U.S. at 415).

"Religion is [a] viewpoint from which ideas are conveyed." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 n.4 (2001). The First Amendment prohibits the state from "bas[ing] laws or regulations on hostility to a religion or religious

---

[4]Although Rebertus advanced another penological interest—"safety and security inside the facility"—the district court found that Rebertus's letter "raised only the rehabilitation concerns," not security concerns. *Schmitt*, 2024 WL 3904665, at *3. In this appeal, we need not resolve whether the MDOC advanced its security interest in terminating Quest.

viewpoint." *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018). "[T]he government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Id.* The "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). Moreover, the government "may not discriminate against some or all religious beliefs." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 461 (2017) (internal quotation marks omitted). And even "subtle departures from neutrality on matters of religion" are prohibited by the Free Exercise Clause. *Masterpiece Cakeshop*, 584 U.S. at 638 (internal quotation marks omitted). In sum, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

Governmental policies affecting First Amendment liberties must be neutrally applied. "If a policy is not neutrally applied, it cannot withstand constitutional scrutiny." *Baxter II*, 129 F.4th at 504 n.4 (citing *Turner*, 482 U.S. at 90). "For example, although 'inmate rehabilitation' is a legitimate government interest, a prison may not censor 'literature advocating racial purity' on the ground that exposure to racist ideas inhibits rehabilitation." *Sisney*, 15 F.4th at 1190 (first quoting *Dawson*, 986 F.2d at 261; then quoting *McCabe v. Arave*, 827 F.2d 634, 638 (9th Cir. 1987)).[5]

---

[5]*See also Thornburgh*, 490 U.S. at 416 n.14 (explaining that "regulations barr[ing] writings that 'unduly complain' or 'magnify grievances,' express 'inflammatory political, racial, religious or other views,' or are 'defamatory' or 'otherwise inappropriate' . . . . were decidedly not 'neutral' in the relevant sense" because they "fairly invited prison officials and employees to apply their own personal prejudices and opinions as standards for prisoner mail censorship" (quoting *Martinez*, 416 U.S. at 415)); *Emad v. Dodge Cnty.*, 71 F.4th 649, 653 (7th Cir. 2023)

Here, although the MDOC set forth a legitimate government interest, its termination of Quest was not "in a neutral fashion, without regard to the content of the expression." *See Turner*, 482 U.S. at 90.

Rebertus's letter plainly states that the MDOC did not oppose Schmitt teaching generally about "manhood, or the study of masculinity"; instead, it objected to Schmitt discussing the topic "*through a biblical lens of* what a 'real man looks like'" or through what the MDOC perceived as "*through a lens of* discrimination, exclusivity, gender biases and stereotypes." R. Doc. 16-2, at 3 (emphases added); *see also* R. Doc. 22, at ¶¶ 11–12 ("Quest's content devalues women and LGBTQ+ individuals," contains "stereotypes," and "promote[s] negative beliefs about certain groups of people").[6] In short, the MDOC objected to Schmitt's religious viewpoint

("[T]he district court agreed that the jail policy limiting group prayer serves the interests of security, institutional order, and staff safety, thereby satisfying the first factor of the *Turner* test. Although true that security interests often can justify limitations on group gatherings in the prison context, a policy that operates to discriminate against Muslim detainees cannot satisfy *Turner* as a matter of law." (internal quotation marks omitted)); *cf. Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1320 (11th Cir. 2024) (holding that jail officials' objections to "the following teachings: (1) persons who *are* baptized through full immersion *will* go to Hell; (2) persons with a tattoo(s) will go to Hell; or (3) persons who take medications will go to Hell. . . . indicate that while they will permit discussions that don't mention Hell, or even of things that won't land one in Hell, they won't tolerate discussion of things that will result in damnation" (internal quotation marks omitted)).

[6] The fact that the MDOC offers "a variety of [other] *Christian*-based programming and worship opportunities for its incarcerated population" does not render its decision to terminate Quest a neutral one. R. Doc. 22, at ¶ 13 (emphasis added). Viewpoint neutrality prohibits the MDOC from favoring other Christian viewpoints or denominations over Schmitt's. *Cf. Larson v. Valente*, 456 U.S. 228, 244–45 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another. . . . This constitutional prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause.").

on masculinity. This is viewpoint discrimination. As a result, the MDOC has failed to satisfy the threshold *Turner* factor, and we need not proceed further. *See Hum. Rts. Def. Ctr.*, 129 F.4th at 504 ("Without a rational connection to a legitimate governmental interest, a policy fails the *Turner* test irrespective of whether the other factors tilt in its favor." (internal quotation marks omitted)). Because *Turner* is not satisfied, Schmitt has established his likelihood of success on the merits.

## B. *Remaining* Dataphase *Factors*

"When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (internal quotation marks omitted). First, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). Second, "it is always in the public interest to protect constitutional rights." *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019) (internal quotation marks omitted). Third, "the balance of the equities generally favors the constitutionally-protected freedom of expression." *Id.* (cleaned up).

Based on our conclusion that Schmitt is likely to succeed on the merits of his First Amendment claim, we also find that the other *Dataphase* factors weigh in his favor. *See Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) (explaining that, in a First Amendment case, likelihood of success on the merits is "often the determining factor in whether a preliminary injunction should issue") ("In a First Amendment case, therefore, the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue.") , *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) (en banc).

### III. *Conclusion*

Accordingly, we reverse the district court's denial of Schmitt's motion for a preliminary injunction and remand to the district court for entry of an order reinstating the Quest program at MCF pending a full adjudication of the case on the merits.

KELLY, Circuit Judge, dissenting.

In my view, MDOC makes a strong argument that its rehabilitative programming constitutes government speech. Given the unusual circumstances of this case, I would reach that argument and affirm the denial of a preliminary injunction.

As I see it, it is common sense that a prison, like a school, can curate the programming it provides. *See Walls v. Sanders*, --- F.4th ---, 2025 WL 1948450, at *4 (8th Cir. July 16, 2025) (explaining that, in the context of a public school curriculum, the government "has substantial, if not absolute, discretion in selecting what materials and information to provide"). MDOC voiced a version of this common-sense argument when opposing Schmitt's motion for a preliminary injunction.[7] Here, where Schmitt seeks an atypical type of preliminary injunctive relief—requiring a prison to reinstate rehabilitative programming it does not want to provide—I would address MDOC's argument. *See Gap, Inc. v. GK Dev., Inc.*, 843 F.3d 744, 748–49 (8th Cir. 2016) (noting that this court has the discretion to "address[] new arguments raised on appeal where the new issue is encompassed in a more general argument previously raised and no new evidence is presented on appeal" (quoting *United States v. Hirani*, 824 F.3d 741, 751 (8th Cir. 2016))).

---

[7]*See, e.g.*, R. Doc. 37 at 24 ("It may be that Mr. Schmitt is the facilitator, but if you're an inmate and you sign up for . . . programming . . . while you are incarcerated, it is clearly being at least tacitly endorsed by the DOC."); *id.* (arguing that Schmitt does not have "a right to determine what DOC programming is going to look like").

"When the government wishes to state an opinion, . . . to formulate policies, or to implement programs, it naturally chooses what to say and what not to say." *Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022). Whether the government is speaking for itself or opening a forum for the speech of others can pose line-drawing problems, particularly when the government "invites the people to participate in a program." *Id.* at 252. This case is an example, as MDOC permits volunteers to help with programming. In these instances, "we conduct a holistic inquiry . . . to determine whether the government intends to speak for itself or to regulate private expression." *Id.* We consider "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.*

By statute, the MDOC Commissioner is required to "develop, implement, and provide" an array of rehabilitative programming, including programs addressing domestic abuse, sex offender treatment, and career programming. *See* Minn. Stat. Ann. § 244.03, subd. 1(a). "[S]electing, designing, and implementing programs under this section are the sole responsibility of the commissioner." *Id.* § 244.03, subd. 1(b). This statutory command plainly authorizes the government to speak for itself in developing and curating rehabilitative programming. The Commissioner has done so for a long time, *see* Minn. Stat. § 243.85 (1961), and I struggle to see how the public would view rehabilitative programming in a prison as less controlled by the government than a curriculum in a classroom.[8] *See Walls*, 2025 WL 1948450, at *4; *cf. Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 135 (1977) ("[A] prison is most emphatically not a 'public forum' . . . ."). It thus seems natural to me to conclude that MDOC's rehabilitative programming constitutes government speech,

---

[8]The fact that volunteers convey the government's chosen rehabilitative programming does not change the fact that the government is speaking. Cf. Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 204–06, 208 (2015) (holding that "specialty license plates . . . convey government speech" despite the fact that private individuals display the messages).

-18-

casting doubt on Schmitt's free-speech and free-exercise claims. *See Matal v. Tam*, 582 U.S. 218, 234 (2017) ("When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others.").[9]

I also view the remainder of the *Dataphase* factors differently. *See Dataphase, Sys.*, 640 F.2d at 114. Even assuming Schmitt has suffered a free-speech or free-exercise harm, any such harm appears to be mitigable while the lawsuit progresses: the government represents that Schmitt may offer the exact same content from the Quest program to incarcerated individuals in other ways, such as via the mail, small group visitation, or, as the government said at oral argument, possibly through group religious services arranged with the chaplain. And in my view, the public interest and balance of the equities weigh strongly in favor of MDOC. Schmitt seeks to force a prison to reinstate a program—with the prison's stamp of approval—that the prison concluded was "harmful and hinder[ed] the rehabilitation process for incarcerated individuals." Typically, we defer to prison administrators about these things. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."). I would not pick this case as the rare scenario where we deviate from that general rule.

---

[9]Schmitt did not move for a preliminary injunction on his Establishment Clause claim, and the record is currently unclear on whether the prison regulates religious programming, and whether, or to what extent, religious and rehabilitative programming are intertwined. *See* Minn. Stat. Ann. § 244.03 (noting that "the commissioner must develop" various rehabilitative programs, including "spiritual and faith-based programming," but only "as appropriate"); *see also Walls*, 2025 WL 1948450, at *4 ("Government speech is not immune from all constitutional challenges . . . . The Establishment Clause, for example, limits government speech."). But, as I explain below, I would reserve adjudication of these issues for a completed record, without granting a preliminary injunction.

This case presents cross-cutting and complex legal issues, and the record is incomplete. In light of the circumstances of this case and the specific preliminary relief Schmitt seeks, these very reasons—a lack of factual development and the need for additional legal analysis—counsel in favor of denying, not granting, the preliminary injunction. Indeed, "[a]t the early stage of a preliminary injunction motion, the speculative nature of this particular inquiry militates against any wooden or mathematical application of the test." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998) (noting that at the preliminary injunction stage, "a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene . . . [before] the merits are determined." (citation omitted)).

I respectfully dissent.

_____